**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

**SUSAN NORWOOD**                                                    **PLAINTIFF**

**v.**                          **NO.** _____

**UNITED PARCEL SERVICE, INC.**                              **DEFENDANTS**

**<u>COMPLAINT</u>**

COMES NOW, Plaintiff, Susan Norwood, by and through counsel, and for this Complaint states:

**<u>Parties</u>**

**1.**      Plaintiff, Susan Norwood, was at all times relevant a resident of Kansas; and, a white female married to a black man, who started working for UPS on September 1, 1986.

**2.**      Defendant United Parcel Service is a for-profit, corporation, doing business in an industry substantially impacting interstate commerce and employing more than 500 people in the state of Kansas during each week in 2017, 2018, and 2019 with its principal place in Georgia. Defendant is a federal contractor subject to OFFCP regulations.  The events leading to this lawsuit took place in Kansas.  Venue is proper under 28 USC 1391(b), and this Court has federal question subject-matter jurisdiction under 28 USC 1331, as well as supplemental jurisdiction under 28 USC 1367

**3.**      This is an action for violation of the Kansas Act Against Discrimination, the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1963, as amended, and the Americans with Disabilities Act of 1990 in the form of gender discrimination, disability discrimination, and retaliation, as well as for wrongful discharge in violation of public policy, brought in an amount exceeding that required for diversity jurisdiction.

4.      Thus, this Court has personal and subject matter jurisdiction over these issues, and venue is proper.  Plaintiff timely filed a charge of discrimination with the EEOC.  She now files this action within ninety (90) days of receiving her right to sue letter, attached as **Exhibit "A.**"

### GENERAL ALLEGATIONS OF FACT

5.      Plaintiff started working for Defendant in 1986.

6.      At all times relevant, Plaintiff has performed her job satisfactorily.

7.      On May 27, 2016, Plaintiff met with Stan Roux. They discussed future candidates for promotions.  Stan spoke in a negative manner about John Jardes and some of the issues UPS was having with his lack of intensity at work due to his disability and use of FMLA leave.  Roux at one point of the conversation said, to" Plaintiff. I don't know why he just doesn't retire."

8.      On May 31, 2016, Plaintiff was flown to St. Louis to meet with Mr. Waring Lester, Operations Manager and Stan Roux, Human Resources Manager. In this meeting Plaintiff was asked if she would take the Division Manager's job in KC building. West Central Division. They were moving John Jardes to West Division, which was the Plaintiffs  Division at the time.  Stan said that since Plaintiff's Division was running so well, and that Plaintiff had groomed Reuben Logan to be the next Division Manager even if John wasn't there much, Reuben would keep the Division together.

9.      Mr.  Lester had not been in the District long when this decision was made. During this meeting Mr. Lester began to make troubling comments. At the time of the meeting with the Plaintiff, he stated that it was not his idea to put Plaintiff in the KC Building and that he didn't feel it was fair since John Jardes had basically burned the placed down and now we were going to send him to a Division running well, and Plaintiff had to start over. Stan stated, it was closer to home for Plaintiff and since

Plaintiff had some medical issues with her parents they felt like it would be easier for her. Thus, Plaintiff's use of FMLA leave was a factor in the decision to transfer the Plaintiff to the troubled Division.

10.     Plaintiff commented, "Just for the record, I have never requested to be taken off the road."  Stan Roux agreed, then he said, "This is what you're good at, cleaning up operations.  We will give you all the support you need." Plaintiff said, to both of them, that the West Central Division was a  tough  Division. Plaintiff had cut teeth in that building as a young Supervisor and was promoted in that building as a Manager, Plaintiff felt like Plaintiff could fix it with their support.

11.     On June 1, 2016, Plaintiff started in the KC Building. Plaintiff met with John Jardes. Plaintiff took him through all of her A.M. Meeting agenda's, Daily role ups, QIP Process, her action plans, Strat plans and Trend graphs.  Plaintiff turned to him and asked what he had. He said, " I got nothing. Whatever you did in West Division you should do here, and you will be fine." He turned and left the office. For the rest of the week, Plaintiff met with each Manager and Supervisor to see who, and what, they were about and determined that the Division was in more trouble than expected. The staffing was not adequate  going  into  their  peak  season.  Plaintiff  stated  they  had  no  structure  or organization at all. Plaintiff had spoken several times to District Manager, Fern Shaw, regarding the status of the Division. Fern advised Plaintiff that the people in the Division were broken. They previously had poor leadership and that the Plaintiff needed to make it fun for them to come to work again.

12.     On June 6, 2016,  Plaintiff flew to Ontario, California, for a Dispatch Workshop with Kari Jo Allen. Fern Shaw had chosen her and Plaintiff since they had the best DPS plans in the District consecutively. This was prior to coming to West Central Division. However, this  left  the Division  unattended  to begin  the  structure  that  was  needed  so

desperately.

**13.**     On June 10, 2016, Plaintiff flew home from California. Plaintiff got off the plane and drove to Wichita, KS, to move her office to Kansas City.

**14.**     On June 17, 2016, Plaintiff and her husband drove to St. Louis for the Urban League Salute to Women gala. Plaintiff had been one of the District's Womens Leadership and Development Staff Managers. Plaintiff mentored and Developed Future Women for Leadership roles.  Plaintiff was asked by Stan Roux to participate and invited several ladies to attend.  Eric Henderson, Marvin Franks, and the Plaintiffs were all expected to make sure all tables were filled. Stan Roux, Human Resources Manager, said he would not be attending.

**15.**     Plaintiff also attended a Women's Leadership and Development event on Monday, October 10, 2016. In spite of her role taking over the *Most Help Needed Division*, the Plaintiff still stayed involved with the District Women's Leadership Coordinator at the request of Fern Shaw.

**16.**     On October 12, 2016, Plaintiff received a phone call informing her that her Mother had had a seizure. Plaintiff was attending a meeting in St. Louis at the time. Plaintiff drove back to Kansas City, arriving back home late. Plaintiff drove straight to the Hospital. Mr. Lester had instructed Plaintiff to text him to let him know Plaintiff made it back safe.   Fern Shaw sent several text messages to the Plaintiff during the time she was dealing with her family emergency concerning her mother.

**17.**     Plaintiff gave reasonable notice of her need for leave.  On October 13, 2016, she text UPS about her mother's health.   Fern Shaw sent a reply text to Plaintiff, " Your heart will guide you. Let me know if there is anything that I can do. I am here for you." UPS responded, "take as much time as you need, take care of your family." Plaintiff's mother was diagnosed with low brain capacity. The doctors were not sure if Plaintiff's

mother would be able to continue to swallow. Plaintiff was her mother's POA and is the decision maker for Plaintiff's parents. The Plaintiff's family had to determine if they were going to put her on Hospice or not. Plaintiff's entire family was in denial. It was a very difficult time for Plaintiff, as well as a stressful time. The Plaintiff, and her family, eventually decided to send her mother back to the nursing home.

18.     On October 17, 2016, Plaintiff received a text from District Manager, Fern Shaw, asking her to confirm whether or not she had spoken to On-Road Supervisor, Julia Lewis. Plaintiff was made aware of a situation with Julia Lewis that involved Facebook, text messages from a driver's wife, and allegations that had been made that were upsetting to Julia Lewis. This apparently started previous to Plaintiff taking over the Division. Plaintiff reached out to Rebecca Aciego for her to visit with Julia on this situation. There had been several incidents and pending legal matters that were left for the Plaintiff to deal with from the previous Division Manager.

19.     Plaintiff opposed racial discrimination.  Plaintiff received a call from Mr. Lester. He wanted to move Jeff King off pre-load. Plaintiff was not sure why because since King was her strongest Manager.  Mr. Lester wanted to replace him with Wardell Hooks, an African American Manager. Plaintiff told him that was not a good idea since Wardell was not deemed a strong Manager. Mr. Hooks also had history in that Division in which there were allegations made that Mr. Hooks had made inappropriate advances toward a PT female supervisor that worked for him. At the time, there was a pending lawsuit involving a young lady that worked in revenue recovery on pre-load. This, along with several other reasons, were given to Mr. Lester as to why it would not be good idea for Wardell to take over the pre-load at that time.  Plaintiff also had Mike Bayers, who was a stronger Supervisor, going through surgery that was on pre-load. Plaintiff was concerned by taking Mr. King off pre-load that would leave it with a less experienced persons to run

the unload, along with a new FT Supervisor running the front. Plaintiff was already promoting a new Supervisor that Fern spoke highly of, who was Asian.  Plaintiff was concerned about this promotion since she did not have any on-road experience. Plaintiff felt like it would be too challenging for a new Manager to come into the pre-load operation  going into peak season.

20.     Lester asked Plaintiff about Gary Allen, another African American Manager. Plaintiff told him that it was not a good idea with all the controversy and complaints that had been made about Gary Allen. Plaintiff didn't feel the environment was good for him to be in. Mr. Allen could be very aggressive, and Plaintiff had witnessed his aggressive behavior first-hand. He said both of these gentlemen should have a shot as a Division Manager. He asked if Plaintiff knew the story behind what happened to Gary Allen in that he used to be a Division Manager until they railroaded him and demoted him. He said, "I am here to right the wrong of African Americans that have been discriminated against and should have been promoted." He was pretty upset when Plaintiff said that was okay with Plaintiff, but that was not the case with these two (2) individuals. This is when it became apparent that Mr. Lester favored black folks. There were many incidents that were displayed in which it became apparent to Plaintiff that Mr. Lester was prejudice. He was "okay" with Kelly Ceesay and Plaintiff since they had been married or were married to black men.

21.     Despite Plaintiff's opposition, Mr. Lester  brought in Wardell Hooks and he worked peak village in December.  Jeff King stayed on as Pre-load Manager through peak season. Wardell's first day was a total disaster. He did not dispatch drivers out of the village until 10:00 am. Wardell also made poor decisions that cost the company many delays. Waring Lester then promoted Supervisor, Karen Martin, to be the Business Manager, in Chillicothe, Higgensville, and St Joe, Missouri. She replaced Gary Allen.

Allen stayed with Karen through peak season, then came to work in the Plaintiff's division on and off until he retired.  Anthony Streit, Wardell Hooks, and Gary Allen's former Division Manager told Plaintiff that he did not recommend this change for either party. Anthony Streit did not feel that this was a good fit for the environment in KC either. Anthony Streit told Plaintiff that Gary Allen had several legal issues that had been *race* related from the Chillicothe Center and felt that this was the reason Mr. Lester moved him to KC. Karen Martin, is a Supervisor, whom Stan Roux and Plaintiff had discussions regarding her attendance and her professionalism problems.  When Plaintiff asked Stan Roux how was it possible that she was promoted over  others  more qualified, his response was, " Fern likes her."

22.     On November 6, 2016, Plaintiff's father had another heart attack. They did a procedure  at Providence St. Margaret Hospital.  In all the years Plaintiff had worked at UPS, this was the most stressful peak season for her. Plaintiff  did not have enough drivers staffed.  As a matter of fact, Driver Supervisors had to deliver almost every day. Plaintiff expressed the shortage numerous times during the weekly District Staffing calls. Plaintiff was short pre-loaders every day in the Kansas City building. This contributed to part-time supervisors having to load cars daily.  This created the lack of ability to train pre-loaders quickly enough to learn the job. Driver's came in and worked to help get their cars loaded, and Plaintiff told Stan Roux about this practice.  Stan Roux told Plaintiff he was aware of this. Plaintiff told Stan Roux this was illegal under the FLSA because they were not on-the-clock and were not getting over-time. Plaintiff has saved text messages starting from November 28, 2016 with communications to District Manager, Fern Shaw, and Waring Lester, that they were short on helpers. Human Resources Supervisor, Eric Day, was struggling to get helper applicants for the Kansas City building. The UPS hub in Kansas City is a very old facility. Numerous times we had belts break or power

outages. As a matter of fact, on November 28, 2016, we had a belt break. We launched drivers late. The management group stayed that evening to make sure all volume that was brought back was processed on time.

23.    Plaintiff had several new drivers that were new "cover drivers" for peak. All of Plaintiff's Managers, including herself, worked 12 to 14-hour days to make sure everything was processed. On Tuesday, November 29, 2016, Fern Shaw text Plaintiff and asked how she was doing because Plaintiff had been to Urgent Care the previous Sunday for respiratory issues due to probable Pneumonia. Plaintiff did not miss any work during this time. Fern Shaw would text Plaintiff daily and go through Helper Plan. She was fully aware that they had concerns with hiring enough helpers. On December 16, 2017, for instance, Plaintiff text Fern Shaw stating they had given PCM to drivers to help recruit more helpers to assist Human Resources. But, the good news was that the they had beat last years' cost by 4.2 cents on a plan by 3.8 cents. Fern Shaw would end most calls with her famous saying during peak. "Keep calm and have fun." On December 18, 2018, after a day when the building had difficulty running due to weather.  Plaintiff sent a text to Fern Shaw at 6:45 p.m. that read "I just want you to know I am not calm, nor having fun...I am depressed." Fern Shaw's response at 6:56 pm was "LOL".

24.    From January 9, 2017 to January 13, 2017, Tom Vanleer, Region Health and Safety Manager, came to visit the facility.  During this time, the Managers and Plaintiff were going to St. Louis for the District Health & Safety Council Meeting  This was surprising to the Plaintiff since all her Managers would be in St Louis. West Central had been the least-best noted in safety results in the District before she had taken it over.  At first review and when she learned of this was when the Region Manager, along with the staff, had gone through a few notes from the previous visit that they had completed when John Jardes was the Division Manager.

25.     During the January 10, 2017 and January 12, 2017 District Health and Safety Meetings, Plaintiff was able to Speak to Tom Vanleer, Region Occupational Health and Safety Manager. He said that during the interviews with the hourly Safety Company Chairs he was impressed that the attitudes were great and that they felt they had the time and support to make Kansas City a safe environment.  Tom Vanleer then told the Plaintiff that, generally, this is not the case when they do an audit of this nature on a the least-best operations.   Plaintiff explained to him that I had not been in the Division but six (6) months. Three (3) of those months were spent trying to survive peak with the staffing issues that had not been addressed by the previous Division Manager, John Jardes. Tom Vanleer and Eddie Louisea both told the Plaintiff, and the Management Team, they could see a difference in the attitudes of the Employees. Tom and the Plaintiff discussed changing the current Health and Safety Supervisor, Julie Stavely, to a different position. The Plaintiff and Tom Vanleer both felt Julia Lewis would be a better fit. Julie Stavely was not a good fit for that position and Stan Roux agreed with Plaintiff when the Plaintiff discussed it with him. The Plaintiff had several write ups from Julie Stavely indicating her lack of efficiencies regarding the safety position, The Plaintiff reviewed these documents with Stan Roux so there would be no cause for any concerns by her being removed from that position.

26.     On February 2, 2017, Plaintiff took a day off to get a pap-smear. Plaintiff had Cervical Cancer in February, 2008; and, this was a routine follow up. Plaintiff had also gone to see Dr. Vassa for a colonoscopy consult. These were all routine physicals that were done annually. The Plaintiff generally scheduled these appointments in November every year. However, since the Plaintiff was transferred to the new division, there were many activities that prevented her from making those appointments.

**27.**     On February 8, 2017 and February 9, 2017, Plaintiff drove to St. Louis for a District Safety Council Meeting.

**28.**     On February 13, 2017, Plaintiff had a routine Mammogram and Colonoscopy procedure.

**29.**     On February 20, 2017, Plaintiff received results of her pap-smear. Her physician was concerned that her cancer may have returned. Plaintiff was emotional and depressed. Plaintiff called Mr. Lester and asked to go home.  Plaintiff was crying and visibly upset with news.

**30.**     on February 24, 2017, Plaintiff took a D-Day to obtain a biopsy at Dr. Wilson's office to check for the return of Cancer.

**31.**     On February 28, 2017, there was a Safety Head to Head with Steve Ricci. Steve Ricci and Plaintiff reviewed her Team's Safety Plans and Structures. He took Plaintiff through the Heat Map, which indicates if you are improving or getting worse in relationship to injuries and crashes. The Division had shown improvements in some areas but stayed stagnant in others. Plaintiff explained her challenges in staffing and the ability to have supervisors available to adequately train. Plaintiff explained to Steve Ricci that they had several management spots open throughout the Division.  During the first twelve (12) months, Plaintiff had a vacancy of three (3) Managers, with seven (7) Supervisors new to their jobs.  Manager, Ron Dodge, of Jefferson City and Rolla was out for almost a year with health problems. It took almost six (6) months to replace him. He had a Supervisor that was out for almost a year in Jefferson City that had medical issues that never returned. That left only two (2) supervisors to run that center, one (1) of the supervisors were brand new. During this time the full time Manager, Jeff King, was removed from pre-load. They replaced him with Wardell Hooks, who was not a strong Manager. Plaintiff lost Julie Stavely to disability and Mike Bayers to disability on pre-

load. They were both replaced with new FT Supervisors that needed to be trained. Plaintiff had to replace six (6) On-Road Supervisors for Special Assignments, Disability, Promotions, etc. This was very challenging as Plaintiff approached starting the largest Saturday ground delivery operation yet to be started in the District.

32.     Steve Ricci and Plaintiff discussed the continued challenges of Union Steward, Bryan Rooney, who had been recruiting lawsuits from anyone who had been hurt on-the-job. He told Plaintiff not to get discouraged since they had changed the way our frequencies worked now. It takes longer to get incidents to drop off to show better frequencies. It was now a rolling twelve (12) months. He said he has tried to explain to those above his pay grade that it takes time to build a Safety Culture and to not get discouraged. Plaintiff had made steps in the right direction by changing the Safety Supervisor for the Division as well. Julia Lewis was very engaged, more so than the previous Supervisor that John Jardes put in charge of Safety.

33.     In March 2, 2017, Plaintiff received news that biopsy was not cancer. The cells were showing at risk. Dr. Wilson said it could be due to stress. Dr. Wilson had started Plaintiff on medication. Plaintiff was scheduled for a stress test to determine if a serious health condition was present because heart attacks run in her Family,

34.     From March 11, 2017 to March 19, 2017, Plaintiff took vacation. During this time, on March 13, 2017, Plaintiff underwent a stress test with Dr. Green at SMMC. Plaintiff had been having migraines and not sleeping at night.

35.     On March 22, 2017, Plaintiff reportedly was suffering a migraine and was going home. However, Plaintiff text Stan Roux to discuss an employment situation with Jimmie Parr, a Manager, who has had multiple situations with safety infractions, failed audits, and improper disposal of hazardous materials. Stan Roux agreed that we needed to meet with Jimmie Parr to document, again, the severity of the situation(s). Plaintiff and Stan

Roux had even discussed his loss of raise and possible demotion.

36.     During an April 12, 2017 staff meeting, Plaintiff indicated, once again, that they were having understaffing issues for the Saturday implementation coming.

37.     Discriminating and harassing comments were made to three (3) female management employees. Stan Roux was not happy that Rebecca Aciego went over his head to region about incident. Fern was not happy that she had this black cloud over the district.  They were all afraid the implementation was going to be bad since there was little support; however, the implementation was a success.

38.     On April 20, 2017, there was supposed to be a meeting where Mr. Lester planned to go through the final review of the implementation. Prior to the review, there was an cncident with Kelly Ceesay, Nikki Spataro and Plaintiff. In a closed-door meeting, before an entire conference room full of people waiting on the parties to discuss the Saturday implementation, Mr. Lester took the Plaintiff, Manager, Kelly CeeSay, and Supervisor, Nikki Spataro, into the Plaintiff's office and closed the door. Mr. Lester began to say that women are soft, and their drivers don't respect them,  In his statement, he told the ladies how he was going to adopt West Center so they know that he is going to defend his *girls*. Plaintiff objected to this statement; and, thereafter, Mr. Lester began to target her.

39.     On April 22, 2017, there was First Saturday Deployment. Mr. Lester had called Plaintiff during her PCM meeting. Plaintiff did not answer since she was giving the PCM to the Driver group and doing the ribbon ceremony. Tasha Hovland, IE Division Manager, asked Plaintiff to call Mr. Lester.  Upon Plaintiff returning Mr. Lester's call, he started yelling at Plaintiff, asking why her drivers had not left the building yet.

40.     Plaintiff told Lester they would be starting at 8:30 a.m. and it was 9:20 a.m. Plaintiff attempted to explain that there were two (2) sets of driver groups, just the way we had discussed and that was how it was in the MOP.  Mr. Lester said, " That was not

what I reviewed with group" further stating that Plaintiff had an integrity issue and he wanted a write up from her. If this implementation goes wrong I will be reporting it to Fern Shaw. He falsely claimed Plaintiff was "being insubordinate and should have followed the plan." Tasha, the IE Division Manager, was the only Staff Manager from the District BPU group that attended. There was a corporate coordinator that attended as well.

41.     Plaintiff spoke to Tasha Hovland and told her what Mr. Lester said.  Plaintiff was upset, and Tasha Hovland remarked with, "make sure you write everything down. You have to cover yourself." Plaintiff also talked to Rebecca Aciego about it as well. Plaintiff spoke to the corporate coordinator in front of Tasha Hovland and Roger Riddle. Plaintiff asked the corporate coordinator what he interpreted the start times to be. His response was, "I knew you had staggered start times, and due to the labor environment, you had to post a start time. However, I know that if drivers started earlier we would launch them". All but three (3) drivers started at the suggested start time.

42.     Plaintiff asked Mr. Riddle what his interpretation of the start times were. He replied the same way. The corporate coordinator wrote an email to the District BPU as to how much detailed planning had taken place and confirmed we discussed the start times, along with the success of the implementation.  Plaintiff sent Mr. Lester a screen-shot of the MOP showing him that he was wrong. Plaintiff never heard from him after that. However, when Cindy Rosen interviewed him about that incident, he of course denied it.

43.     Neither Fern Shaw, Stan Roux nor Mr. Lester were present for the implementation. This was the _larges_t Saturday implementation thus far; and, their absence was a deviation from normal practice at UPS.

44.     During the implementation Nikki Spatarro brought up to another Manager, Hamilton Terrell, that she was upset over the meeting with Waring. Plaintiff was told this

by Roger Riddle. Plaintiff addressed it with Kelly Ceesay, first, and Kelly, too, said she was upset about it still and that Nikki had spoken to her as well.

45.    Plaintiff contacted Rebecca Aciego the same day as the implementation. Plaintiff asked Rebecca Aciego to speak to Nikki Spatarro and Kelly Ceesay regarding the incident. Later, Rebecca Aciego got back with Plaintiff and explained she involved Cindy Rosen, Region Employee Relation Manager. Rebecca Aciego told the Plaintiff that Cindy Rosen would be reaching out to her and the other two (2) ladies. She also interviewed Roger Riddle, Manager in Kansas City North. In all of these meetings, *all* parties confirmed the incident that took place. Rebecca Aciego told the Plaintiff that Cindy Rosen would be reaching out to her and that a write up was not needed from her.

46.    After the Saturday implementation  Plaintiff had her Summer Planning meeting with Jason Roy, Cassie Felts, Tasha Haglund, Eric Day, Mr. Lester, Anson Wallace, Roger Riddle, and Kelly Ceesay,

47.    This meeting was prior to Cindy Rosen interviewing Mr. Lester of the allegations made.

48.    During the Summer planning meetings there was an incident with an altercation with Mr. Lester and Anson Wallace over the Saturday Implementation. Mr. Lester stated that he was on a region call and had told them we had the best implementation in the Kansas City Building.   This is the first time anyone in the Kansas City Building had been told by Mr. Lester that the implementation was a success. Mr. Lester had joined a few calls prior to the implementation in which he would jump on the call for a few minutes only to announce himself or make negative comments about implementation. Plaintiff has several IM's from other UPS Management people who questioned his negative behavior toward the Plaintiff.

49.     Mr. Lester said he had told Region that he had another Staff Manager involved in the implementation, Anthony Streit.  Anson Wallace stated, " If holding a cup of coffee in your hand all morning constitutes your involvement, I guess he was involved. He wasn't at none of our meetings. We in this Division were the reason for the success of the implementation." Mr. Lester watched as if he were surprised, he tried to blow off the outburst by looking at her and saying, "Why are your Managers so angry?"

50.     At that point Tasha saw the meeting going South and ask Jason and Cassie to go next door for a conference call.  They adjourned the meeting to take a break. When they walked out of the meeting Mr. Lester stopped Plaintiff by the mail area and said, "Why are your people all uptight. They all are angry. Look like they are ready to fight somebody." Plaintiff explained to him that for weeks on calls he has told them they would be unsuccessful, and the implementation would fail. Now that it was successful he never came back and told them nice job and that it appeared that the only one he gave credit to was Anthony, who had zero involvement.  Plaintiff also expressed to him that he needs to be careful how he says things that people will misinterpret them. He asked for an example. She told him how Kelly and Nikki were offended by the comments he made on April 20 regarding our inability as women in a male dominated workforce to have respect and that we were soft and that our Drivers didn't respect us.  He asked plaintiff if she felt the same way. She replied, "Yes ". He was visibly angry. Roger Riddle approached us as he heard the comment Mr. Lester then made. He said, " I don't have to come down here. I don't have to deal at all with those ladies. I don't have to deal with you moving forward other than through the QIP process if that's what you all want."  This is false and violates UPS policy and practice, as managers are required to provide support, guidance, mentoring, and supervision to subordinates. They were calling us back to join the meeting. Lunch had arrived, Kelly Ceesay went into her office across from the

conference room to sort it out. Mr. Lester followed her in the office and shut the door. He began to retaliate against her verbally. She could see him standing in front of her. She was visibly shaken. The door opened, he stepped in the conference room and pointed to me and said. "You, come with me. I am going to finish this right now." We walked to the offices in the Hub where Nikki Spatarro was. She was sitting in the office by the phone. Mr. Lester walked in, Kelly and I stood up next to the wall as he began to retaliate against her. He was very angry with Nikki because she showed no signs of being intimidated by him. After that it became apparent that Mr. Lester was going to make plaintiff's life miserable.

51.    On April 27, 2017, Plaintiff spoke to Stan Roux about incident with Mr. Lester regarding his gender slurs.  This was protected activity. The activities after that incident with Mr. Lester the mood of every 6 a.m. meeting from that point was apparent that he would be carrying out his previous threats. Other staff members inquired as to why Mr. Lester would single her out, ask questions that were not ask to any other division manager and belittle her on why she did not have detailed information.

52.    On May 2, 2017, Plaintiff underwent a stress test to determine if she had a serious health condition present.

53.    On May 3, 2017, there was a financial review with Fern Shaw, District Manager, Tasha Haglund, Industrial Engineering Manager, Rob Berry, District Controller, Stan Roux, Human Resource Manager.  Plaintiff was asked why her financial dashboard was showing the furthest off-plan in the District. Plaintiff reviewed several things in this meeting that had been brought up many times previous to this meeting.

54.    Plaintiff brought up to Tasha Hovland that Plaintiff's NDPPH was higher than anyone elses in the District. Plaintiff's Division was expected to be more productive than any other Division. Even though they added Saturday implementation and had several

new service providers still on 30-day packets. Plaintiff asked Rob Berry why the beacons for the package cars' new smart system were not in Plaintiffs packages cars planning as an expense. The technology for the new smart scan was not in the budget. The overtime for the Saturday implementation as well as the new service providers for Saturday ground were not added either. Because of this, it showed that we were over budget. No one in the meeting had answers for Plaintiff's inquiries. Tasha Hovland said she would get back to Plaintiff; but, she never did. Plaintiff believes this was, once again, a plan to discredit Plaintiff since the investigation of Mr. Lester was now on record. Plaintiff was told by Karen Augustine, CHSP Manager, " They are mad because you don't eat your own" I asked her what she meant by that. "She explained later that since the Plaintiff was a Division Manager the BPU Team expectations would defend the allegations against Waring Lester. It made the District look bad since the allegation had now involved the Region.

55.     However, Plaintiff had spoken to Fern Shaw that same day and she said Plaintiff was very prepared for the review. Plaintiff never received any answers back from anyone present during the staff meeting as to why West Central's finance planning was so off-kilter.

56.     On May 8, 2017, there was text from Kelly saying she just spoke to Cindy Rosen for a half an hour.

57.     On May 19, 2017, Plaintiff met with Stan Roux in Jefferson City to meet with Jimmie Parr and review disciplinary action(s).  UPS kept accusing Plaintiff of failing to hold her people accountable.  However, Plaintiff had taken two (2) Managers, Jimmie Parr and Ted Thulin, and had meetings with Stan Roux as to what discipline it would take for them not doing their jobs. There were multiple write ups and reviews that Stan Roux had been involved in. Yet none lost any stock or pay increases.

58.    On June 7, 2017, in another instance of harassment tried to intimidate Kelly in her office,  Mr. Lester came to visit Kansas City. Kelly texted Plaintiff and said Mr. Lester had ignored her all morning. He had not spoken a word to her. He just stuck his head in her office did not say anything, looked around and never made eye contact with her, then just shut the door. Plaintiff told her to be cool and remain calm. Evidently, they were there to do a surprise Safety Blitz. There seemed to be a pattern when Plaintiff was on vacation, or in St. Louis, when they would have people come in to work in the Division, yet Plaintiff would not be given a written review or be briefed on any of the visits. They would review these at the District Staff level; however, nobody would review the events that took place during the visit. They would attempt to catch Plaintiff off guard, so it would look like she did not know what was going on in her Division. Plaintiff was at a Staff Meeting in St. Louis in which an undercover pre-loader was sent in on Plaintiff's pre-load while she was on vacation. This was not even reviewed with her until the Staff Meeting in front of the entire Staff. These visits continued to reoccur while Plaintiff was on vacation. Plaintiff would asked for write ups on the reviews and what task or training had occurred. Instead, Plaintiff was told that training and support had been given but her people were unresponsive to it. This all violates normal practices and policies at UPS.

59.    On August 10, 2017, Plaintiff's father went to the doctor's office, where they subsequently rushed him to the hospital.   Plaintiff requested FMLA leave because her father who had been rushed to the hospital, was critical on August 11, 2017.

60.    Plaintiff  had a meeting with the region HR Manager and Plaintiff left shortly after that to be with her father.

61.    Plaintiff  returned to Dr. Wilson on August 25, 2017. Dr. Wilson took Plaintiff off work. On August 11, 2017, there was a Review with Pete, Region HR Manager. Plaintiff's father was in the hospital, they were going to have to do a lung procedure. He

had too much fluid in his lungs and his kidneys were failing.

**62.** August 14, 2017, Plaintiff's father had a lung procedure. Plaintiff took a D-Day from working the 1st Saturday implementation.

**63.** On August 15, 2017, her father had surgery, Plaintiff took a D-Day for working the second Saturday of implementation.

**64.** August 25, 2017, Plaintiff had a follow-up pap-smear to check on cancer cells with physician, Dr. Wilson.

**65.** On September 7, 2017, Plaintiff saw a Dr. Bradley for shoulder pain.

**66.** September 12, 2017, Plaintiff met with Tracy Hadel, who was a counselor from the EAP program that Stan Roux recommend that Plaintiff contact.

**67.** In September 12, 2017, Dr. Julia Dragnich took Plaintiff off work for anxiety and lack of sleep. Plaintiff was crying and depressed. Plaintiff took vacation and three (3) d-days instead of going on disability. Tracy Hadel and Dr, Dragnich recommended her to see a psychiatrist.

**68.** On September 20, 2017, Plaintiff went to see Dr. Aznaurova. She recommended Plaintiff to go to IOP intake at Shawnee Mission Medical Center.

**69.** Plaintiff underwent an IOP intake meeting at SMMC at 3:00 p.m., on FMLA. Plaintiff took a week of vacation. Although Plaintiff's father remained in serious condition; Plaintiff, was in contact with Stan Roux and Mr. Lester daily. Stan Rouxtold Plaintiff she needed to reach out for EAP, apparently regarding Plaintiff as disabled. Plaintiff was not doing well because due to lack of sleep. Shortly thereafter, Plaintiff had a meltdown at the hospital requiring her sister to come sit with Plaintiff.

**70.** Plaintiff went to see Tracy Hadel with the EAP on Sept 12, 2017. She was off work at the time. Tracy Hadel recommended that Plaintiff see a Psychiatrist. Plaintiff saw Dr. Aznaurova on September 20, 2017. Plaintiff went to the IOP intake meeting the same

day.

**71.**     Plaintiff   was off work on short term disability from September 25, 2017 to
December 4, 2017. During this time, Plaintiff kept Stan Roux, Waring Lester and Fern
Shaw involved in Plaintiff's medical leave. During this time Plaintiff's mother passed
away on October 11, 2017. Plaintiff, still depressed, asked to return to work on a reduced
schedule. Plaintiff  asked her doctor to return because, historically, if you, as a member of
management, miss peak season you were not looked upon in a good light.

**72.**     Plaintiff also recalled her conversation with Stan Roux regarding John Jardes and
how much grief he received for taking off during peak. Plaintiff expressed this concern to
Dr, Aznaurova, who indicated she would allow Plaintiff to return to work; but, on a part-
time basis to see how Plaintiff would do with the medication and the problem with
sleeping.

**73.**     From December 4, 2017 to December 31, 2017, Plaintiff was working five (5)
hours per day. Plaintiff went back full duty January 2, 2018,

**74.**     Upon Plaintiff's return back to work, on full duty, it was Mark Bowen, Division
Manager had covere the Division in Plaintiff's absence. Stan Roux and Plaintiff spoke
prior to returning back to Division. Stan Roux told Plaintiff that Mark Bowen would be
there for a week or two to get Plaintiff back on track in Division. Mark Bowen would run
conference calls on 6 a.m. call and 4 p.m. call. Waring Lester would communicate
through Mark Bowen during that time. Plaintiff was still attending counseling sessions
with Tracy Hadel through EAP, and remained under the care of Dr. Aznaurova, her
psychiatrist. Within the first week of Plaintiff's return to work Fern Shaw had called to
welcome her back. Plaintiff began to tell her that they had an alleged injury on pre-load
that morning. Mark Bowen and Gary Allen were investigating it. Fern Shaw asked why I
said it was "alleged" that we never use that terminology. I explained that this was how it

was reported to Mark and I, since the young lady was being disciplined and during the review she said her leg hurt, then it was her arm and she wanted to go home. In the past, we deemed this to be alleged; however, still filled out injury report and still sent employee to seek medical attention. Her demeanor then changed, she stated, "What if I alleged that your father was never sick." Stunned, there was silence on the phone. She repeated it again waiting for my response. I replied, "That would not be good." She told me that I was not a doctor and that I needed to just hold my people accountable, that in my absence my management people were out of control. After hanging up the phone call, Plaintiff upset and cried. Plaintiff could not understand why something so sensitive to her, in her still vulnerable state, would be said to her. Plaintiff felt like it was out of line to use her father's illness, as an example. Mark Bowen was looking for the Plaintiff, when the Plaintiff told Mark Bowen about the incident his response was, "That was totally out of line. I am going to call her and let her know how much that upset you." Plaintiff asked him to let it go that she did not need any more retaliation from Waring Lester, Stan Roux or Fern Shaw. The next day, Fern Shaw called the Plaintiff, again after the drivers were dispatched, and while Mark Bowen was in Lenexa that day, and began to tell the Plaintiff since she had returned that she had a work place violence incident with supervisors and several injuries and accidents. One (1) of these injuries was to a supervisor who was injured while Plaintiff was out on FMLA. One (1) of the crashes were during peak when the Plaintiff was out on FMLA. They both were filed several weeks after they occurred. Fern Shaw continued to say that Plaintiff was the problem and she needed to control how her people talked to each other. Fern Shaw began to raise her voice just then, Plaintiff said, " Fern I am glad we are having this conversation."  Plaintiff said, "You are right Fern, it's all about top down leadership. Yesterday when you said, what if I alleged that your father was not sick. Fern my father almost died and my mother

did pass away. How could you say something like that to me? You know this is a very personal and sensitive matter to me? If you don't believe that it happened I will get in my car and drive to St. Louis and show you my father's medical records and my mother's crematory ashes," Plaintiff was crying and visibly upset. Fern Shaw responded, "I am not going to talk to you right now" hanging up on Plaintiff. Plaintiff was so upset, she was having an anxiety/panic attack. Plaintiff and Roger Riddle went into cecurity office and tried to reach out for Cindy Rosen, Employee Relations Manager. The call went to voicemail. Plaintiff called Stan Roux, the call went in to voicemail. Stan Roux called back right away. Plaintiff tried to speak to Stan Roux and tell him what happened. Roger Riddle began to tell him what happened; and, finally, Plaintiff was able to clearly speak and explaining to Stan Roux what happened. Stan told Plaintiff to go home try and calm down that he would speak to her later. He asked Roger Riddle if they needed to call Plaintiff's husband to come get her. Roger Riddle said he would sit with Plaintiff until she was ok to driver or, in the alternative, that he would take her home.

**75.**     Later, Stan Roux and Rebecca Aciego met with Plaintiff at Houligans for lunch. Stan Roux reviewed the plan for moving forward with Plaintiff. Plaintiff asked for this meeting because she was confused as to why Waring Lester deemed her as significant improvement needed on her evaluation during the 4th quarter. Plaintiff was on FMLA the entire 4th quarter. How is it possible to be given this kind of review without her knowledge and without her being there. She brought up the incident with Waring Lester. She brought up the comments that Fern Shaw made. He asked her why she asked Roger Riddle to listen in on her call with her. Plaintiff responded with, "The same reason I guess you brought Rebecca Aciego to this meeting."

**76.**     Plaintiff continued to see medical doctors for severe depression, anxiety, as well as a rheumatologist.

77.     In the beginning of February, 2018, there was yet another safety visit. Plaintiff had been instructed by Fern Shaw to work the pre-load since the pre-load was not on plan. (Plaintiff's pre-load had been on plan until Wardell Hooks became pre-load Manager.) Plaintiff, and other Division Managers, were to work their pre-load until it was on plan. This meant Plaintiff had to be at work at 2 a.m. for pre-sort meetings, as well as her own job functions as a Division Manager. Sometimes, Plaintiff would not leave to go home until after 4:00 p.m. call was over. This meant Plaintiff was working an excess of 15 to 16 hours per day.

78.     On February 2, 2018, Plaintiff seen Dr. Aznaurova. Plaintiff was not sleeping well and could not take sleeping medicine since Plaintiff was not getting eight (8) full hours of sleep. Because of the pre-load hours, Plaintiff's medication was getting out of whack with the new hours of work.

79.     On February 5, 2018, there was another Region Safety Meeting. During this time in February, there was also a District HR Meeting. Pete Elroy from Region was also in attendance. Stan Roux came to the Kansas City Building as well. Plaintiff was told by Karen Augustine and Bryan Lenox that they had been looking at the follow up information on the discipline that had been taken on the service providers in Plaintiff's division. This was one (1) of the only part of the CAPS that Pete Elroy had brought up during previous reviews. There was a driver who was PR seniority that Mark Bowen had put back on the street because he deemed that crash unavoidable. Plaintiff had not been part of that investigation as it was within Plaintiff's first few days back to work while Mark Bowen was still running the Division; and, Plaintiff would leave early to see doctor. Stan Roux had Plaintiff prepare a write up on the incident.  Stan Roux then told the Plaintiff that a Division Manager did not have a right to do that without consulting the CHSP and Health and Safety Managers. Plaintiff confirmed to Stan Roux that she has

always done that and that he may want to reiterate that to the other Division Managers because it happened several times within the District. During peak Anthony had brought back a seasonal driver and so had Mark Bowen, and others, according to Karen Augustine and Bryan Lenox. When Plaintiff asked Karen Augustine about this, it was told to Plaintiff she was to involve Augustine and Bryan Lenox on every crash more, albeit the other Division Managers do not report all their crashes. Karen Augustine recalled both incidents that the Plaintiff inquired about. During this visit Plaintiff was told by Karen Augustine they were trying to pin this on her and dig up things in her Division to try and demote her. Pete Elroy was in the office for a long time talking to Stan Roux and others. Karen Augustine told Plaintiff that Pete Elroy was upset that Waring and Stan Roux had little documentation on Plaintiff and this upset them.

80.    Plaintiff was asked once to come into the office. Waring Lester and Stan Roux reviewed the Plaintiffs QIP and asked how she was being held accountable for other persons' actions and that was not the way the QIP process worked. Plaintiff agreed she would work on the things that she had been responsible for. Plaintiff also brought up the support with staffing and the training of new supervisors. Stan Roux told Plaintiff that Waring Lester and Plaintiff would get together and go through it and that he wanted a write up on how that would look. This meeting lasted all of 5 minutes because Stan Roux and Waring Lester had to catch a plane. Plaintiff told Karen Augustine, that if she was one that had the most help needed and was such a detriment to UPS, you would think she would have had more of a review on my performance. Karen Augustine said, " That was for show so they could say they reviewed your performance because they got their ass kicked by Pete Elroy because they had nothing on you.

81.    Plaintiff was still coming in working pre-load, daily, in Kansas City.  Plaintiff was then asked by Waring Lester to drive to St. Louis and meet with him on March 21, 2018.

Plaintiff was not informed what this meeting was about. She asked what she needed to bring and was told by Mr. Lester, "Bring whatever you think you should bring."

82.     Plaintiff drove to St. Louis arriving in afternoon. Plaintiff was greeted by Mr. Lester who took her back into a private conference room away from other offices. Mr. Lester asked if she had eaten. Plaintiff replied she had not. Mr. Lester retrieved a salad from the front office and gave it to her to eat. Shortly after that Stan Roux arrived and they all sat at the conference table. Stan Roux asked Plaintiff if she knew why she was here. Plaintiff replied she did not. Stan Roux said they were going to review her performance in detail. Plaintiff asked why she was not given the opportunity to bring files and information on the subject and Stan's response was, " Go get your lap top." Plaintiff retrieved her lap top as Mr. Lester began to review Plaintiff's service performance. The first item reviewed was second attempts on ODS messages. Plaintiff was on plan. Mr. Lester fumbled through some papers and add-a-lines as he tried to go through specific elements and find the elements that Plaintiff was off plan on. Each element Plaintiff was asked to respond of plans to get on plan and what the Plaintiff was doing with it, Plaintiff, knowing that whatever answers she would give were not going to be good enough when Stan Roux took over the conversation. Stan Roux asked Plaintiff is she was doing head to heads with the dashboard,  why then was she out of compliance on her own training? Plaintiff stated this was false. Plaintiff responded that she had all her training completed and copies of it. Plaintiff stated that she stayed late on a Friday to complete it and that Julia Lewis and Roger Riddle were there as well. Julia Lewis had helped her print out that particular training because it was printing sideways. Stan Roux seemed frustrated and said that he had a conference call that he had to be on and but that the meeting would resume. Waring Lester stood up and began to leave. Plaintiff asked Waring Lester why he was leaving, and didn't he want to stay and talk to her? After Stan Roux left, Plaintiff

asked Mr. Lester " What are we doing here." It's very apparent that you all didn't asked me to drive all the way to St. Louis to go through my QIP. You have had many opportunities to do that." What are we doing?" Mr. Lester said, "Well Susan what do you want to do for the next six (6) months or a year or two down the road?" Plaintiff responded, "I want to do my Job. I want to run the West Central Division and I still believe that I can fix it with the right support." Waring asked Plaintiff when her planned to retire. Plaintiff responded not for another three to four (3 to 4) years. Waring responded, "Well Susan we are at the end of the runway with you. I am getting beat up every day for the safety results in Kansas City. People are questioning me if I can do my job now. " Stan Roux came back in at that time. Plaintiff then asked Stan, " What is this all about Stan? Let's just cut through the bullshit and tell me why you asked me to drive down here?" Stan slid a piece of paper across to the Plaintiff. It was a letter informing her that she would be put on the MPIP program. Plaintiff was shocked. Plaintiff knew that this was not the way the MPIP program generally was implemented. Plaintiff asked Stan Roux, "What if I don't sign this?"  Stan said, "I recommend that you do." Plaintiff's response was, "I am not asking your recommendation. I am asking you what happens if I don't." Stan Roux's responded, "We would have to take other measures. Susan you're not being fired or anything like that."  Plaintiff ask for a copy of document. Stan refused to give her a copy. Plaintiff felt like she was being bullied and began to get upset. Plaintiff asked to be excused. Plaintiff excused herself to go to the ladies room where she sobbing. Upon Plaintiff's return she told them was done for the evening. Plaintiff was emotionally and physically drained. Plaintiff was having another anxiety/panic attack. Stan Roux asked several times if Plaintiff was going to be "OK". Plaintiff responded, No. I just want to go back to the hotel. Stan Roux asked if the Plaintiff would be ok driving myself to the hotel. Plaintiff packed her brief case and left. Before leaving Plaintiff asked Stan Roux if

there was somewhere she could look up the MPIP process. He said UPSers.com. Plaintiff went back to the hotel room to see if she could find it. Plaintiff could not find it anywhere. Plaintiff called Stan Roux from her hotel room and ask where she could find it. Stan Roux responded, "The procedures changed, it not on UPSers.com. They will have to send it to Waring Lester and he will determine what elements you will have." Stan Roux then said, "The MPIP is a pretty rigorous and intense process. I don't even know in the three (3) months you can even make it." Plaintiff said, " You have me drive to St. Louis to give me a piece of paper and tell me I am on MPIP, tell me you advise me to just go along with it. You won't give me a copy of it. Then when I ask for information on it, you tell me now there is none that I can look at. The manager retaliating against me has full control over this and now you're telling me that I won't be successful? Seriously Stan?" Stan's response was very angry, "I am getting agitated with you and I am not going to discuss this right now. You need to get some rest and we will talk at breakfast. I was just checking to make sure you made it to the hotel ok."

**83.**     The next day Plaintiff had not slept. She woke up early and spoke to her husband.

**84.**     Plaintiff's husband told her to lay back down and try and relax. Plaintiff tried to, but she was having chest pain and shortness of breath. She called her son-in-law who is a paramedic. He told plaintiff to lie down and relax if it didn't subside call 9-1-1. Plaintiff called and left message to Stan Roux that she would be late and was not feeling well. Plaintiff's husband called and he was concerned she was having a heart attack. During their call Stan Roux called. Plaintiff answered his call but still had husband on phone. Plaintiff told Stan she was talking to husband and thought she had conferenced them in. Stan and husband began to speak about Plaintiff and Stan Roux told Plaintiff's husband he could be a hotel in five (5) minutes. Plaintiff's husband asked if Stan Roux was a doctor, to which, " No." Plaintiff's husband called  9-1-1 along with the Hotel Manager

to go and sit with her until they arrived. Upon the paramedics arriving at hotel, Plaintiff was evaluated and it was determined Plaintiff was not having a heart attack, but a panic attack. Plaintiff's husband drove to St. Louis to bring Plaintiff home to follow up with her doctors.

**85.**     Plaintiff met with Dr. Aznaurova on Friday March 23, 2018.

**86.**     Plaintiff returned to work on Saturday, March 24, 2018. Plaintiff continued to work pre-load and found it hard to concentrate during meetings with the increase of the medication to help with anxiety. Plaintiff requested that she move some vacation days to take some time off.  Plaintiff continued to have anxiety and was not sleeping well. Plaintiff was being forced to work different hours and was not receiving a regular sleep schedule. This increased the Plaitiff's anxiety and depression. Plaintiff went back into the intensive outpatient therapy at SMMC  Plaintiff went on short term disability from 3/31/18 to 11/11/18, then to long term disability on 3/27/19.

**87.**     From the first review with Region over the ADA accommodation the plaintiff was allowed to record that meeting. In that meeting, Eric Day had said to the plaintiff at the beginning to hurry up during review. Over the next months, Plaintiff  made several documented attempts to find a resolution for an ADA accommodation that had been supported by her doctors. Plaintiff finally was forced into retirement because UPS failed to engage in a good faith interactive process or provide reasonable accommodations

**88.**     UPS replaced Plaintiff's position and would not let Plaintiff know what status she would be or what she would be doing. During these days UPS attempted to prove that she did not have the ability to hold her Employees accountable.

**89.**     Plaintiff has copies of files indication that to be false. In these reviews Stan Roux was involved in these meetings. Plaintiff  had multiple crisis in her life with almost losing my father twice, to the death of my Mother. Plaintiff  was stressed about possibly having

the return of cancer, going through menopause, being harassed by Mr. Lester.   Plaintiff was harassed daily with text and comments from Fern Shaw.  At one point, Fern Shaw even made a comment to Plaintiff, "What if I alleged your father wasn't sick" She said this on the third (3rd) day Plaintiff returned from Full disability in January. She made the comment that everything that had gone wrong in Plaintiff's Division was Plaintiff's fault and that Plaintiff  made it happen. Roger Riddle witnessed this because Plaintiff had her on Speaker.

90.     Plaintiff then called Cindy Rosen and Stan Roux. Plaintiff was in the restroom at UPS sobbing and angry by her harassment. Stan had me go home to calm down. These Staff Members took the opportunity during the crisis's in Plaintiff's life to retaliate against Plaintiff for speaking out about the discrimination and harassment that had been committed by Mr. Lester.

91.     After she requested accommodation, Plaintiff was asked on several occasions why she  didn't retire. Cindy Rosen asked Plaintiff this after she reviewed her interview with Mr. Lester.  Stan Roux, Eric Day ask Plaintiff this several times. Plaintiff  knew this was the way UPS avoided their duty to accommodate persons with disabilities. Instead of dealing with the person who was the problem, the quiet the victim by intimidation or just make them go away.

## CAUSES OF ACTION
## COUNT I –  DISABILITY DISCRIMINATION

92.     Plaintiff re-alleges the foregoing against UPS, as if fully set out herein.

93.     This is an action for a violation of Plaintiff's rights under Kansas Act Against Discrimination and the ADA.  Plaintiff is, or was regarded as, a person with a disability by virtue of her mental impairments, which substantially limit her ability to think and concentrate.

94.     Plaintiff requested an accommodation of an agenda for disciplinary meetings and the ability to tape record.   Without proper explanation, UPS denied these accommodations, even though they were reasonable.

95.     Defendant has discriminated against Plaintiff on the basis of her disability by failing to accommodate her and holding her accountable under circumstances similarly persons without disabilities.

96.     Plaintiff initially requested an accommodation of an agenda and the ability to tape record her meetings, with UPS retaining the tapes so Plaintiff could address her short-term memory deficits.  Plaintiff's physician supported this request, but UPS refused to engage in a good faith interactive process in violation of the ADA.  Indeed, UPS' response was a categorical refusal.

97.     Indeed. Defendant's actions have been willful, wanton, and intentional, meriting punitive damages.

98.     As a direct and proximate cause of Defendants' acts or omissions as alleged herein, Plaintiff has lost wages and earnings, lost fringe benefits, lost earning capacity, has endured damage to her reputation, mental, emotional, and physical suffering, and has incurred expenses which would not otherwise have been incurred, and incurred other such special damages in an amount to be proven at trial.

## COUNT II - RETALIATION

99.     Plaintiff re-alleges the foregoing against all Defendants as if fully set out herein.

100.    This is an action for a violation of Plaintiff's civil rights pursuant to the Kansas Act Against Discrimination and the ADA.

101.    All Defendants have retaliated against Plaintiff for opposing discriminatory activities and requesting accommodation in violation of the Kansas Act Against Discrimination and the ADA by placing her on a false performance improvement plan

and refusing to accommodate her, resulting in a forced retirement.

### COUNT III - FMLA

102.     Plaintiff incorporates the preceding paragraphs as if fully set out herein.

103.     At all times relevant, Defendant employed more than (300) people during each week in 2017, 2018, and 2019 in an industry affecting interstate commerce.

104.     From time to time during his employment 2017, 2018, and 2019, Plaintiff was forced to take leave because of her disability.

105.     Plaintiff gave timely and proper notice of her need for leave to care for father, her need for leave for own serious health condition, or to determine if a serious health condition existed, and the need for leave as an accommodation under the ADA.

106.     In the year preceding each day in 2017, 2018, and 2019, Plaintiff had worked for more than 1,250 hours in the year preceding each such day at a location where the Defendant employed more than 50 employees within 75 miles of the work site.  Thus, Plaintiff was an eligible employee, as that term is defined by the FMLA.  However, Defendant's time records did not correctly reflect his time in breach of contract.

107.     Plaintiff was under the regular care of doctors for migraines, depression, and heart issues, who had prescribed them prescription medication for their serious health conditions. Thus, Plaintiff had a serious health condition that caused the Plaintiff episodic incapacities to do work, as well as causes her to be unable work more than three days.

108.     However, Defendants failed to give Plaintiff notice of her rights under the FMLA and retaliated against the Plaintiff.  Thus, Plaintiff brings interference and retaliation claims under the FMLA.

109.     Accordingly, Defendants have willfully violated the FMLA.

110.     Plaintiff, therefore, seeks appropriate damages for lost wages, lost fringe benefits, punitive damages, and liquidated damages, unless the Defendant can show its actions

were in good faith.

111.     By virtue of the facts alleged herein, Defendants violated the FMLA by failing to reinstate her and retaliated against her for using FMLA leave by demoting her.

112.     As a direct and proximate cause of Defendants' acts or omissions as alleged herein, Plaintiff has lost wages, lost fringe benefits, lost earning capacity, and has incurred expenses which would not otherwise have been incurred and incurred other such special damages in an amount to be proven at trial.

113.     Defendants' actions have been in willful violation of the law, meriting punitive and liquidated damages.

## COUNT IV - FLSA

114.     Plaintiff incorporates the preceding paragraphs as if fully set out herein.

115.     Plaintiff opposed UPS' practice of working drivers and other employees off the clock, who drive vehicles with GVW of less than 10,000.00 pounds.

116.     Accordingly, Defendants have willfully violated the FLSA by refusing the accommodation Plaintiff requested and forcing her to retire.

117.     Plaintiff therefore seeks appropriate damages for lost wages, lost fringe benefits, punitive damages, and liquidated damages, unless the Defendant can show its actions were in good faith.

118.     By virtue of the facts alleged herein, Defendants violated the FMLA by failing to reinstate her and retaliated against her for using FMLA leave by demoting her.

119.     As a direct and proximate cause of Defendants' acts or omissions as alleged herein, Plaintiff has lost wages, lost fringe benefits, lost earning capacity, and has incurred expenses which would not otherwise have been incurred and incurred other such special damages in an amount to be proven at trial. Defendants' actions have been in willful violation of the law, meriting punitive and liquidated damages.

## COUNT V - GENDER DISCRIMINATION AND RETALIATION

**120.** Plaintiff incorporates the preceding paragraphs as if fully set out herein.

**121.** UPS discriminated against the Plaintiff on the basis of her gender by creating a hostile work environment. Plaintiff was forced into retirement and denied accommodations under circumstances similarly situated males were not.

**122.** As a direct and proximate cause of Defendants' acts or omissions as alleged herein, Plaintiff has lost wages, lost fringe benefits, lost earning capacity, and has incurred expenses which would not otherwise have been incurred and incurred other such special damages in an amount to be proven at trial. Defendants' actions have been in willful violation of the law, meriting punitive damages.

## COUNT VI - RACE DISCRIMINATION AND RETALIATION

**123.** Plaintiff incorporates the preceding paragraphs as if fully set out herein.

**124.** Plaintiff objected to racist comments made by Mr. Lester and Mr. Roux.

**125.** After she complained, Plaintiff was subjected to stricter scrutiny, denied an accommodation, and forced to retire in violation of 42 USC 1981, Title VII, and the Kansas Act against discrimination.

**126.** As a direct and proximate cause of Defendants' acts or omissions as alleged herein, Plaintiff has lost wages, lost fringe benefits, lost earning capacity, and has incurred expenses which would not otherwise have been incurred and incurred other such special damages in an amount to be proven at trial. Defendants' actions have been in willful violation of the law, meriting punitive damages.

**WHEREFORE**, Plaintiff, prays compensatory damages for mental, emotional, and physical suffering, damage to her reputation, embarrassment and humiliation, lost wages past and future, lost earnings past and future, loss of earning capacity, back pay, front pay and/or reinstatement, all in an amount exceeding $75,000, and only limited by what a jury determines to

be a fair and appropriate amount to make her whole, cleansing of her personnel file, a positive reference, designation as re-hirable, a monitor to be appointed to determine ADA compliance, a requirement that all complaints of discrimination or retaliation be kept for seven (7) years, posting of any verdict and other relief obtained along with this lawsuit on boards at her worksite, training for managers, for punitive damages, liquidated damages, other injunctive relief, reasonable attorneys' fees and costs, and a trial by jury.

**Respectfully submitted,**


By: /s/Dustin L. Van Dyk
Dustin L. Van Dyk  Ks. S. Ct #23313
Palmer Law Group, LLP
2348 SW Topeka Blvd.
Topeka, KS  66611
785-223-1836
**COUNSEL FOR PLAINTIFF**


**SUTTER & GILLHAM, P.L.L.C**.
Attorneys at Law
P.O. Box 2012
Benton, AR 72018
501-315-1910  Office
501-315-1916  Facsimile
Attorney for the Plaintiff


By:      /s/ Luther Oneal Sutter
Luther Oneal Sutter, ARBN 95031 (pro hac vice pending)
luthersutter.law@gmail.com