IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

SUSAN NORWOOD,

     Plaintiff,

v.                                    **Case No. 19-2496-DDC-JPO**

UNITED PARCEL SERVICE, INC.,

     Defendant.

## MEMORANDUM AND ORDER

This matter comes before the court on defendant United Parcel Service, Inc.'s Motion to Dismiss Amended Complaint, or in the Alternative, Motion for More Definite Statement (Doc. 13). Plaintiff Susan Norwood filed a Response (Doc. 17) and a Brief in Support of Response (Doc. 16). Defendant replied (Doc. 19). For reasons explained below, the court grants defendant's motion (Doc. 13) in part, and denies it in part.

### I.    Background

#### A.  Procedural Background

On August 22, 2019, plaintiff filed her Complaint (Doc. 1). On October 23, 2019, defendant filed a Motion to Dismiss, or in the Alternative, Motion for More Definite Statement (Doc. 8). Plaintiff then amended her Complaint on November 6, 2019. Doc. 12. The Amended Complaint asserts several claims: (1) disability discrimination violating the Americans with Disabilities Act ("ADA"), and the Kansas Act Against Discrimination ("KAAD"), Kan. Stat. Ann. §§ 44-1001–1014, (2) retaliation violating the ADA and the KAAD, (3) interference and retaliation violating the Family Medical Leave Act ("FMLA"), and (4) race discrimination and

retaliation violating 42 U.S.C. § 1981.  Defendant again moved the court to dismiss, or in the alternative, for a more definite statement.  Doc. 13.

### B.  Factual Background

Plaintiff's 40-page, 194-paragraph Amended Complaint does its readers few favors.  The filing required the court to navigate a narrative that jumps midsentence between third and first-person, industry jargon and undefined acronyms, individuals who are referenced without introduction, and events that are presented without regard for their chronology.  Plaintiff's factual allegations are hard to follow, but the court nonetheless accepts as true all well-pleaded allegations in plaintiff's Amended Complaint and views them in the light most favorable to her. *SEC v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014).

This case emerges from the stormy sunset of plaintiff's long career working for defendant.  During these final years, "Plaintiff . . . had multiple cris[e]s in her life[.]"  *Id.* at 33 (Am. Compl. ¶ 157).  Defendant's "Staff Members took the opportunity during the cris[es] in Plaintiff's life to retaliate against Plaintiff for speaking out about the discrimination and harassment that had been committed" in the workplace. *Id.* (Am. Compl. ¶ 159).  During this same period, "Defendant . . . fail[ed] to accommodate her [disability] and [held] her accountable under circumstances similarly persons without disabilities . . . were not."  *Id.* at 35 (Am. Compl. ¶ 169).  "Plaintiff . . . performed her job satisfactorily until she was forced to retire in 2019 upon threat of termination."  *Id.* at 2 (Am. Compl. ¶ 6).

Plaintiff started working for defendant in 1986.  *Id.* at 1–2 (Am. Compl. ¶¶ 1, 5–6).  She "had cut teeth in th[e] ["KC Building"] as a young Supervisor and was promoted in that building as a Manager[.]"  *Id.* at 3 (Am. Compl. ¶ 13).  Later, she worked in the "West Division" which management believed "was running so well" as of May 2016.  *Id.* at 2 (Am. Compl. ¶¶ 8–9).

"On May 31, 2016, Plaintiff was flown to St. Louis to meet with Mr. Waring Lester, Operations Manager and Stan Roux, Human Resources Manager.  In this meeting Plaintiff was asked if she would take the Division Manager's job in KC building.  West Central Division."  *Id.* (Am. Compl. ¶ 8).  "During this meeting, Mr. Lester began to make troubling discriminatory comments" and "stated that it was not his idea to put Plaintiff in the KC Building."  *Id.* at 2–3 (Am. Compl. ¶ 10).  "Stan [Roux] stated, it was closer to home for Plaintiff and since Plaintiff had some medical issues with her parents, [defendant's] management felt like it would be easier for her."  *Id.* at 3 (Am. Compl. ¶ 11).  Plaintiff clarified that she had "'never requested to be taken off the road.'  Stan Roux agreed, then he said, 'This is what you're good at, cleaning up operations.'"  *Id.* (Am. Compl. ¶ 12).  "West Central" was a troubled division with various problems when plaintiff took it over.  *See id.* at 2–3, 6, 10 (Am. Compl. ¶¶ 10–12, 15, 25, 38, 40).

"On June 1, 2016, Plaintiff started in the KC Building."  *Id.* at 3 (Am. Compl. ¶ 14). After a week in her new position, plaintiff "determined that the [West Central] Division was in more trouble than expected" and "concluded the Division had no structure or organization at all." *Id.* (Am. Compl. ¶ 15).  Stan Roux and Waring Lester helped plaintiff solve an issue with a problematic employee by promoting that employee and filling the resulting vacancy with Gary Allen, a black employee.  *Id.* at 4 (Am. Compl. ¶ 16).  "Waring Lester was great with [the] idea since he wanted Gary [Allen] to get an opportunity to right the wrong for the fairness with African Americans that [defendant] had wronged.  Lester also suggested that the white male good old boys were part of the issues."  *Id.*

On October 12, 2016, plaintiff learned "that her Mother had had a seizure."  *Id.* at 5 (Am. Compl. ¶ 22).  The next day, plaintiff "text[ed] [defendant] about her mother's health" and "gave

reasonable notice of her need for leave." *Id.* at 6 (Am. Compl. ¶ 23).  "[Defendant] responded, 'take as much time as you need, take care of your family.'" *Id.*  "It was a very difficult time for Plaintiff, as well as a stressful time . . . Nonetheless, Plaintiff continued to work, even though her mother had a serious health condition." *Id.* (Am. Compl. ¶ 24).

In her new role in the West Central Division, plaintiff discussed personnel promotion decisions with her supervisors.  Some of "[t]hese decisions appeared to be racial discrimination." *Id.* at 7 (Am. Compl. ¶ 28).  For example, plaintiff "promot[ed] a new Supervisor . . . who was Asian.  Plaintiff was concerned about this promotion since she did not have any on-road experience." *Id.*  Later, "Plaintiff received a call from Mr. Lester" who wanted to replace plaintiff's "strongest Manager[,]" Jeff King, "with Wardell Hooks, an African American Manager." *Id.* at 6 (Am. Compl. ¶ 26).  "Plaintiff told Mr. Lester that this was not a good idea since Wardell [Hooks] was not deemed a strong Manager" and "also had history in that Division in which there were allegations made that Mr. Hooks had made inappropriate advances toward a PT female supervisor that worked for him." *Id.* at 6–7 (Am. Compl. ¶ 26).  Given the recent promotion of the Asian employee who lacked on-road experience, "Plaintiff felt like it would be too challenging for a new Manager to come into the pre-load operation going into peak season." *Id.* at 7 (Am. Compl. ¶ 28).

"Lester also asked Plaintiff about Gary Allen, another African American Manager. Plaintiff told him that it was not a good idea with all the controversy and complaints that had been made about Gary Allen." *Id.* (Am. Compl. ¶ 29).  Anthony Streit, the "former Division manager" of Wardell Hooks and Gary Allen, "told Plaintiff that he did not recommend this change for either party" and "did not feel that this was a good fit for the environment in [Kansas City] either." *Id.* at 8 (Am. Compl. ¶ 31).  "Streit told Plaintiff that Gary Allen had several legal

issues that had been race related from the Chillicothe Center and felt that this was the reason Mr. Lester moved [Gary Allen] to [Kansas City]." *Id.*

Lester told plaintiff that "both [Wardell Hooks and Gary Allen] should have a shot as a Division Manager" and said, "I am here to right the wrong of African Americans that have been discriminated against and should have been promoted." *Id.* at 7 (Am. Compl. ¶ 29). In response, plaintiff told Lester that his goal to advance African Americans to correct for discrimination and failures to promote them "was okay with Plaintiff, but that was not the case with these two (2) individuals." *Id.* This response made Lester "pretty upset" and "[t]his is when it became apparent [to plaintiff] that Mr. Lester favored lesser qualified black folks." *Id.* "Despite Plaintiff's opposition, Mr. Lester brought in Wardell Hooks[.]" *Id.* at 8 (Am. Compl. ¶ 30). "There were many incidents that were displayed in which it became apparent to Plaintiff that Mr. Lester was prejudiced against white employees. But Mr. Lester was initially 'okay' with Kelly Ceesay[1] and Plaintiff since they had been married or were married to black men." *Id.* at 7–8 (Am. Compl. ¶ 29).

In late 2016, plaintiff's team was struggling with staffing problems due to too few "pre-loaders," "helpers," and drivers. *Id.* at 8–9 (Am. Compl. ¶¶ 32–33). Plaintiff notified her superiors of these problems and their consequences. *Id.* (Am. Compl. ¶¶ 32–33, 35). One colleague, Fern Shaw, "would end most calls with her famous saying during peak. 'Keep calm and have fun.'" *Id.* at 9 (Am. Compl. ¶ 35). "On December 18, 2018, . . . Plaintiff sent a text to Fern Shaw . . . that read 'I just want you to know I am not calm, nor having fun . . . I am

---

[1]     The Amended Complaint (Doc. 12) also repeatedly refers to Kelly Ceesay as "Kelly CeeSay." When quoting the Amended Complaint, the court spells this name as actually written in the quoted passage.

depressed.'  Fern Shaw's response . . . was 'LOL'." *Id.* at 10 (Am. Compl. ¶ 36).[2]  "Plaintiff was serious.  Her depression had caused her to be unable to remember items as she once did and was causing her to be substantially limited in her ability to think, concentrate, and sleep." *Id.* (Am. Compl. ¶ 37).

"On February 20, 2017, Plaintiff received results of" a medical test that made "[h]er physician . . . concerned that [plaintiff's] cancer may have returned.  Plaintiff was emotional and depressed.  Plaintiff called Mr. Lester and asked to go home.  Plaintiff was crying and visibly upset with [the] news." *Id.* at 11 (Am. Compl. ¶ 45).  "On March 2, 2017, Plaintiff received news that [the] biopsy was not cancer.  The cells were showing at risk." *Id.* at 13 (Am. Compl. ¶ 52).  Her doctor "said it could be due to stress" and "started Plaintiff on medication." *Id.* Meanwhile, "Plaintiff had been having migraines and not sleeping at night." *Id.* (Am. Compl. ¶ 53).  "On March 22, 2017, Plaintiff reportedly was suffering a migraine and was going home.  The migraines interfere with Plaintiff's ability to think, concentrate, and sleep and substantially limits these major life activities." *Id.* (Am. Compl. ¶ 54).

Plaintiff's understaffing challenges at work were joined by "discriminating and harassing comments . . . made to three (3) female management employees BY MR. LESTER." *Id.* at 14 (Am. Compl. ¶ 56) (capitalization in original).  "On April 20, 2017, . . . there was an incident with Kelly Ceesay, a white person, Nikki Spataro[3] and Plaintiff." *Id.* (Am. Compl. ¶ 57).  "Mr. Lester took the Plaintiff, Manager, Kelly CeeSay, and Supervisor, Nikki Spataro, into the

---

[2]     The court wonders whether plaintiff intended to allege that this text message conversation occurred in 2017.  The Amended Complaint alleges this text exchange happened on December 18, 2018. *See* Doc. 12 at 10 (Am. Compl. ¶ 36).  But this 2018 date is inconsistent with both the dates alleged in the surrounding paragraphs of the Amended Complaint, and the content of plaintiff's other allegations.

[3]     The Amended Complaint also spells this person's name as "Nikki Spatarro."  When quoting the Amended Complaint, the court spells this name as actually written in the quoted passage.

Plaintiff's office and closed the door.  Mr. Lester began to say that women are soft, and their drivers don't respect them[.]  In his statement, Mr. Lester told the ladies how he was going to adopt West Center so Plaintiff, Manager, Kelly CeeSay, and Supervisor, Nikki Spataro, would know that he is going to defend his *girls*." *Id.*  "Plaintiff objected to this statement as discriminatory; and, thereafter, Mr. Lester began to retaliate against her and create a hostile work environment." *Id.*

During a phone call two days later, Lester "started yelling at Plaintiff, asking why her drivers had not left the building yet." *Id.* at 15 (Am. Compl. ¶ 59).  "Plaintiff told Lester they would be starting at 8:30 a.m. and it was 9:20 a.m." *Id.* (Am. Compl. ¶ 60).  "Plaintiff attempted to explain that" she was operating "just the way we had discussed and . . . how it was in the MOP."[4] *Id.*  "Mr. Lester said, 'That was not what I reviewed with group' further stating that Plaintiff had an integrity issue and he wanted a write up from her.  If this implementation goes wrong, Mr[.] Lester said he would be reporting it to Fern Shaw.  He falsely claimed Plaintiff was 'being insubordinate and should have followed the plan.'" *Id.*  "Lester had not treated Plaintiff this way until after she had engaged in a protected activity." *Id.*  "Plaintiff also sent Mr. Lester a screen-shot of the MOP showing him that he was wrong.  Plaintiff never heard from him after that.  However, when [someone later asked] Mr. Lester about that incident, he of course denied it." *Id.* at 16 (Am. Compl. ¶ 62).

The same day that Lester yelled at plaintiff about the delay, "Plaintiff contacted Rebecca Aciego" and "asked [her] to speak to Nikki Spatarro and Kelly Ceesay regarding the incident with Mr. Lester." *Id.* (Am. Compl. ¶ 65).  Rebecca Aciego later told plaintiff that "she involved Cindy Rosen, Region Employee Relation Manager." *Id.*  "Plaintiff therefore participated in an

---

[4]     The Amended Complaint never defines "MOP."

investigation to see if discrimination had occurred and also opposed discrimination." *Id.* (Am. Compl. ¶ 66).

"On April 27, 2017, Plaintiff spoke to Stan Roux about [the] incident with Mr. Lester regarding his slurs." *Id.* at 19 (Am. Compl. ¶ 78). Plaintiff also "told [Lester] how Kelly and Nikki were offended by the comments he made on April 20 regarding the women's inability as women in a male dominated workforce to have respect and that [they] were soft and that [their] Drivers didn't respect [them]. He asked plaintiff if she felt the same way. She replied, 'Yes'. Although this was protected activity, Mr. Lester was visibly angry and began retaliating against the Plaintiff." *Id.* at 18 (Am. Compl. ¶ 74). "The activities after that incident with Mr. Lester and the hostile mood of every 6 a.m. meeting from that point made apparent that Lester would be carrying out his previous threats to 'take care' of the Plaintiff." *Id.* at 19 (Am. Compl. ¶ 78). "Seeing his attitude and actions, other staff members inquired as to why Mr. Lester would single Plaintiff out, ask questions that were not asked to any other division manager and belittle Plaintiff on why she did not have detailed information." *Id.* (Am. Compl. ¶ 79).

During a May 3, 2017 "financial review" with a group of colleagues that did not include Lester, "Plaintiff was asked why her financial dashboard was showing the furthest off-plan in the District." *Id.* at 19 (Am. Compl. ¶ 81). "[T]he numbers incorrectly showed that Plaintiff's Division was over budget." *Id.* at 19–20 (Am. Compl. ¶ 83). "Plaintiff believes this was, once again, a retaliatory plan to discredit Plaintiff since the investigation of Mr. Lester was now on record." *Id.* at 20 (Am. Compl. ¶ 84). "Plaintiff was told by Karen Augustine, CHSP[5] Manager, 'They are mad because you don't eat your own[.]' Plaintiff asked her what she meant by that.

---

[5]     Plaintiff does not define "CHSP."

[Augustine] explained later that since the Plaintiff was a Division Manager the BPU[6] Team expectations would defend the allegations against Waring Lester.  Plaintiff's complaint and the resulting investigation made the District look bad since the allegation had now involved the Region."  *Id.* (quotation marks omitted).

Amid her challenges at work, plaintiff's family suffered various health issues.  On August 11, 2017, Plaintiff advised defendant of her father's hospitalization and "requested FMLA leave" and took two "D-Days[.]"[7]  *Id.* at 21–22 (Am. Compl. ¶¶ 92–95).  On "September 12, 2017, Plaintiff met with Tracy Hadel, who was a counselor from the EAP[8] program that Stan Roux recommended that Plaintiff contact."  *Id.* at 22 (Am. Compl. ¶ 98); *see also id.* (Am. Compl. ¶ 103).  That same day, "Dr. Julia Dragnich took Plaintiff off work for anxiety and lack of sleep.  Plaintiff was crying and depressed.  Plaintiff took vacation and three (3) d-days instead of going on disability.  Tracy Hadel and Dr[.] Dragnich recommended her to see a psychiatrist."  *Id.* (Am. Compl. ¶ 99); *see also id.* (Am. Compl. ¶ 103).  "On September 20, 2017, Plaintiff went to see Dr. Aznaurova.  She recommended Plaintiff to go to IOP[9] intake at Shawnee Mission Medical Center."  *Id.* (Am. Compl. ¶ 100).  "Plaintiff underwent an IOP intake meeting . . . at 3:00 p.m., on FMLA.  Plaintiff took a week of vacation."  *Id.* (Am. Compl. ¶ 101).

"Stan Roux then told Plaintiff she needed to reach out for EAP, apparently regarding Plaintiff as disabled.  Plaintiff was not doing well because due to lack of sleep.  Shortly

---

[6]     Plaintiff does not define "BPU."

[7]     Plaintiff does not define "D-Day."

[8]     Plaintiff does not define "EAP," but assumes it abbreviates Employee Assistance Program.

[9]     Plaintiff does not define "IOP."

thereafter, Plaintiff had a meltdown at the hospital requiring her sister to come sit with Plaintiff." *Id.* (Am. Compl. ¶ 102). "Plaintiff was off work on short term disability from September 25, 2017 to December 4, 2017." *Id.* at 23 (Am. Compl. ¶ 104); *see also id.* at 25 (Am. Compl. ¶ 117) ("Plaintiff was on FMLA the entire 4th quarter.").

"Plaintiff, still depressed, asked to return to work on a reduced schedule.  Plaintiff asked her doctor to return because, historically, if you, as a member of management, and miss peak season [defendant] retaliated against the empl[o]yee." *Id.* at 23 (Am. Compl. ¶ 104). "Plaintiff expressed this concern [about retaliation] to [her psychiatrist] Dr[.] Aznaurova, who indicated she would allow Plaintiff to return to work; but, on a part-[]time basis to see how Plaintiff would do with the medication and the problem with sleeping." *Id.* (Am. Compl. ¶ 105). "From December 4, 2017 to December 31, 2017, Plaintiff was working five (5) hours per day.  Plaintiff went back full duty January 2, 2018[.]" *Id.* (Am. Compl. ¶ 106).

"Within the first week of Plaintiff's return to work Fern Shaw" used plaintiff's father's illness as an example during a conversation about employee requests "to go home." *Id.* at 23–24 (Am. Compl. ¶¶ 108–110). "After hanging up the phone call, Plaintiff [was] upset and cried." *Id.* at 24 (Am. Compl. ¶ 110).  During another phone conversation the following day, plaintiff told Fern Shaw that she objected to her mentioning plaintiff's father.  "Plaintiff was upset, and she was having an anxiety/panic attack." *Id.* at 25 (Am. Compl. ¶ 113).  Sometime during this same week, Shaw commented to plaintiff "that everything that had gone wrong in Plaintiff's Division was Plaintiff's fault and that Plaintiff made it happen." *Id.* at 33 (Am. Compl. ¶ 158). "Such conduct would not have happened, had Plaintiff been allowed to tape record" as plaintiff requested later that year. *Id.* at 32–33 (Am. Compl. ¶¶ 154, 158).

"Plaintiff continued to see medical doctors for severe depression, anxiety, as well as a rheumatologist." *Id.* at 26 (Am. Compl. ¶ 118). "On February 2, 2018, Plaintiff saw Dr. Aznaurova. Plaintiff was not sleeping well and could not take sleeping medicine since Plaintiff was not getting eight (8) full hours of sleep." *Id.* (Am. Compl. ¶ 121). "Dr. Aznaurova eventually concluded that Plaintiff was depressed and substantially limited in her ability to sleep, think and concentrate and supported Plaintiff's request for accommodation." *Id.* (Am. Compl. ¶ 122).

During a March 21, 2018 meeting with Lester and Roux, Lester "asked Plaintiff when she planned to retire" and then Roux informed her that "she would be put on the MPIP program"—a performance improvement plan. *Id.* at 28, 30 (Am. Compl. ¶¶ 132, 140–41). "Plaintiff knew that this was not the way the MPIP program generally was implemented." *Id.* at 30 (Am. Compl. ¶ 141). Plaintiff "was placed on a MPIP under circumstances similarly situated black males . . . were not" and "outperformed other Division Managers, yet she was disciplined . . . and they were not." *Id.* at 38 (Am. Compl. ¶¶ 191–92).

During this meeting with Lester and Roux, "Plaintiff felt like she was being bullied and began to get upset." *Id.* at 30 (Am. Compl. ¶ 143). "Plaintiff was emotionally and physically drained" and "was having another anxiety/panic attack." *Id.* (Am. Compl. ¶¶ 143–44). "The next day Plaintiff had not slept" and "was having chest pain and shortness of breath." *Id.* at 31 (Am. Compl. ¶¶ 147–48). Plaintiff spoke with her husband by phone from her hotel. *Id.* (Am. Compl. ¶¶ 146–48). "Plaintiff called and left a message to Stan Roux that she would be late and was not feeling well." *Id.* Roux and plaintiff's husband then spoke by phone. *Id.* (Am. Compl. ¶ 149). "Plaintiff's husband called 9-1-1 along with the Hotel Manager to go and sit with her

until they arrived.  Upon the paramedics arriving at [the] hotel, Plaintiff was evaluated and it was determined Plaintiff was" having "a panic attack."  *Id.*

On March 23, 2018, Plaintiff met with her psychiatrist, Dr. Aznaurova, who "again recommended Plaintiff seek accommodations for disability."  *Id.* at 32 (Am. Compl. ¶ 150).  The next day, plaintiff returned to work where she "found it hard to concentrate during meetings with the increase of the medication to help with anxiety.  Plaintiff requested that she move some vacation days to take some time off.  Plaintiff continued to have anxiety and was not sleeping well."  *Id.* (Am. Compl. ¶ 151).  Plaintiff's "different" work hours and irregular sleep schedule increased her anxiety and depression.  *Id.*  She returned to "intensive outpatient therapy[.]"  *Id.* (Am. Compl. ¶ 152).  "Plaintiff went on short term disability from 3/31/18 to 11/11/18, then to long term disability on 3/27/19.  Plaintiff was, and continues to be, substantially limited in her ability to think, concentrate, and sleep."  *Id.*

"Over the next months, Plaintiff made several documented attempts to find a resolution for an ADA accommodation that had been supported by her doctors.  Plaintiff requested the ability to tape record certain meetings and an agenda for certain meetings[.]"  *Id.* (Am. Compl. ¶ 154).  "Plaintiff initially requested an accommodation of an agenda and the ability to tape record her meetings, with [defendant] retaining the tapes so Plaintiff could address her short-term memory deficits."  *Id.* at 35 (Am. Compl. ¶ 170).  "With accommodation, Plaintiff could have performed the essential functions of her job[.]"  *Id.*  Defendant "refused to engage in a good faith interactive process" and "failed to . . . provide reasonable accommodations."  *Id.* at 32 (Am. Compl. ¶¶ 154–55).  Defendant's "response was a categorical refusal without explanation."  *Id.* at 35 (Am. Compl. ¶ 170).  "[W]ithout the accommodations, Plaintiff could not perform her job

and was forced to retire." *Id.* But, "Plaintiff . . . performed her job satisfactorily until she was forced to retire in 2019 upon threat of termination." *Id.* at 2 (Am. Compl. ¶ 6).

## II.      Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Although this rule "does not require 'detailed factual allegations,'" it demands more than "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court explained, "'will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must assume that the factual allegations in the complaint are true. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). But the court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice'" to state a claim for relief. *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678). Also, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555 (citations omitted).

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*,

550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1192 (10th Cir. 2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." (citation omitted)).

### III.   Discussion

### A.   Count I:  Disability Discrimination Under ADA and KAAD

Defendant argues that the court should dismiss Count I because plaintiff's Amended Complaint (Doc. 12) fails to set forth sufficient allegations showing that (1) she is disabled; (2) she is a qualified individual; or (3) she suffered an adverse employment action.  Doc. 14 at 4–6.

The ADA prohibits discrimination "against a qualified individual on the basis of disability[.]"  42 U.S.C. § 12112(a).  In 2008, Congress passed the Americans with Disabilities Act Amendments Act (ADAAA) "with the stated goal of ensuring that [t]he definition of disability . . . be construed in favor of broad coverage."  *Adair v. City of Muskogee*, 823 F.3d 1297, 1305 (10th Cir. 2016) (citation and internal quotation omitted).  To meet this goal, Congress amended the definition of the term "disability" in the ADA.  *Id.*  Under the ADA's amended definition, "[t]he term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ."  42 U.S.C. § 12102(1).  Kansas law parallels the ADA's definition.  *See* Kan. Stat. § 44-1002(j).  "Whether an individual is disabled under the [ADA] is 'a highly fact sensitive issue, requiring an individualized inquiry and case-by-case determination.'"

14

*Bethscheider v. Westar Energy*, No. 16-4006-CM, 2017 WL 131608, at *3 (D. Kan. Jan. 13, 2017) (quoting *Dutton v. Johnson Cnty. Bd. of Cnty. Comm'rs*, 859 F. Supp. 498, 506 (D. Kan. 1994)).

### 1. "**Disability**"

Defendant asserts that plaintiff "has not stated facts that she is disabled within the meaning of the ADA or the KAAD." Doc. 14 at 5. Defendant argues that plaintiff "only makes the conclusory allegation that she is a person with a disability because her mental impairments, which includes depression and other undefined mental impairments, 'substantially limit her ability to think and concentrate.'" *Id.* (quoting Doc. 12 at 34 (Am. Compl. ¶¶ 165–166)). Defendant asserts the Amended Complaint is "devoid of *facts* showing she has a record or a history of depression, or her other undefined mental impairments, that limits her ability to think or concentrate, and is generally regarded as having that impairment by anyone." *Id.* at 6.

Plaintiff responds that she sufficiently has alleged her depression and "mental impairments" constituted a disability. *See* Doc. 16 at 5–6 (citing Doc. 12 at 10–11, 13, 22–23, 34 (Am. Compl. ¶¶ 36–37, 45, 52, 99, 104–105, 166)). Plaintiff also asserts that the Amended Complaint's ¶ 102 adequately alleges that Stan Roux "apparently regarded Plaintiff as disabled" because he told plaintiff that "she needed to reach out for EAP[.]" Doc. 16 at 6 (citing Doc. 12 at 22 (Am. Compl. ¶ 102)).

### a. **Disability Under Subsection (A)**

To assert a disability within the meaning of subsection (A) of 42 U.S.C. § 12102(1), "a plaintiff must 'articulate with precision' both her impairment and the major life activity it substantially limit[s]." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1218 (10th Cir. 2010) (quoting *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003)). The Tenth

Circuit has construed "the phrase 'substantially limiting' to require an impairment that renders an individual either unable or significantly restricted in ability to perform a major life activity 'compared to the average person in the general population.'"  *Rhodes v. Langston Univ.*, 462 F. App'x 773, 778 (10th Cir. 2011) (quoting *Johnson*, 594 F.3d at 1218).  The ADA includes the following activities within the definition of major life activity:  caring for oneself, performing manual tasks, sleeping, walking, standing, lifting, bending, concentrating, and working.  42 U.S.C. § 12102(2)(A).

Here, the Amended Complaint alleges that "Plaintiff is, or was regarded as, a person with a disability by virtue of her mental impairments" and that "Plaintiff's physicians have concluded that her mental impairments substantially limit[] her ability to sleep, think and concentrate and will continue to do so in the foreseeable future."  Doc. 12 at 34 (Am. Compl. ¶ 166).  Similarly, plaintiff alleges that her "depression had caused her to be unable to remember items as she once did and was causing her to be substantially limited in her ability to think, concentrate, and sleep[,]" *id.* at 10 (Am. Compl. ¶ 37), and that on "September 12, 2017, Dr. Julia Dragnich took Plaintiff off work for anxiety and lack of sleep.  Plaintiff was crying and depressed[,]" *id.* at 22 (Am. Compl. ¶ 99).  "Plaintiff was not doing well . . . due to lack of sleep."  *Id.* (Am. Compl. ¶ 102).  "Plaintiff was off work on short term disability from September 25, 2017 to December 4, 2017."  *Id.* at 23 (Am. Compl. ¶ 104).  Plaintiff describes this as "medical leave."  *Id.*  "Plaintiff, still depressed, asked to return to work on a reduced schedule."  *Id.*

These allegations suffice as they comport with the standard adopted by § 12102(2)(A).  They plead a disability within the meaning of 42 U.S.C. § 12102(1)(A).

### b. Disability Under Subsection (C)

The Amended Complaint also sufficiently alleges a disability under subsection (C) of 42 U.S.C. § 12102(1). To allege that her "employer regarded [her] as having an impairment," a plaintiff must assert that "(1) [s]he has an actual or perceived impairment, (2) that impairment is neither transitory nor minor, and (3) the employer was aware of and therefore perceived the impairment at the time of the alleged discriminatory action." *Adair*, 823 F.3d at 1300, 1306. To state a claim under this subsection, a plaintiff "no longer needs to plead and prove that the actual or perceived impairment substantially limited one or more major life activities." *Id.* at 1306 (citations and internal quotation marks omitted). But a plaintiff must allege that the impairment is not "'transitory and minor.'" *Id.* (quoting 42 U.S.C. § 12102(3)(B)). A transitory impairment is one "with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B).

Here, plaintiff alleges that Stan Roux, the Human Resources Manager "apparently regard[ed] Plaintiff as disabled" because he "told Plaintiff she needed to reach out for EAP[.]" *Id.* at 22 (Am. Compl. ¶ 102). Plaintiff followed that directive. *Id.* (Am. Compl. ¶ 98) ("Plaintiff met with . . . a counselor from the EAP program that Stan Roux recommended that Plaintiff contact."). Plaintiff alleges that that she has suffered the symptoms of her mental illness for an extended period. *See id.* at 32 (Am. Compl. ¶ 152) ("Plaintiff went on short term disability from 3/31/18 to 11/11/18, then to long term disability on 3/27/19. Plaintiff was, and continues to be, substantially limited in her ability to think, concentrate, and sleep."). She asserts that her "physicians have concluded that her mental impairments substantially limit[] her ability to sleep, think and concentrate and will continue to do so in the foreseeable future." *Id.* at 34 (Am. Compl. ¶ 166); *see also id.* at 26 (Am. Compl. ¶ 122).

The court concludes that plaintiff's allegations suffice to plead adequately that her impairment is neither transitory nor minor.  And the court concludes that plaintiff has alleged facts showing that her employer regarded her as having an impairment.

## 2.  "Qualified Individual"

The ADA "prohibits employers from discriminating against employees on the basis of disability and requires employers to make 'reasonable accommodations' to 'qualified individual[s],' unless the accommodations impose an undue hardship on the employer."  *EEOC v. Tricore Reference Labs.*, 849 F.3d 929, 933 (10th Cir. 2017) (quoting 42 U.S.C. §§ 12112(a), (b)(5)(A)).  Defendant argues that plaintiff "has not established that she was a 'qualified individual.'"  Doc. 14 at 6.

A "'qualified individual' . . . is someone who, 'with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'"  *Tricore Reference Labs.*, 849 F.3d at 933 (quoting 42 U.S.C. § 12111(8)).  Defendant argues that plaintiff has "alleged only that '[a]t all times relevant, Plaintiff has performed her job satisfactorily' and that she could perform the essential functions of her job with an accommodation."  Doc. 14 at 6 (citing Doc. 12 (Am. Compl. ¶¶ 6, 165, 170)).  Defendant asserts that the Amended "Complaint is otherwise lacking entirely of facts that would show [plaintiff's] ability to perform essential functions of any position with Defendant[.]"  *Id.*

Plaintiff responds that the Amended Complaint alleges in ¶¶ 6–7 facts showing that she was qualified.  *See* Doc. 16 at 7.  Paragraph 6 alleges that at "all times relevant, Plaintiff has performed her job satisfactorily until she was forced to retire in 2019 upon threat of termination."  Doc. 12 at 2 (Am. Compl. ¶ 6).  Plaintiff also argues that the Amended Complaint alleges various facts showing plaintiff's strength as an employee during her employment.  *See* Doc. 16 at

7 (citing Doc. 12 at 2–3 (Am. Compl. ¶¶ 8–11); then quoting *id.* (Am. Compl. ¶¶ 11–13); then citing *id.* (Am. Compl. ¶ 14); then citing *id.* at 4 (Am. Compl. ¶ 18); then citing *id.* at 9–10, 12 (Am. Compl. ¶¶ 35, 38–40, 47–48)).

Defendant replies that plaintiff "fails to point to, or make, any factual averments about her qualifications in 2018 and 2019, the time she alleges she was purportedly denied 'reasonable accommodations' and was 'forced' to retire." Doc. 19 at 4. But the Amended Complaint alleges that plaintiff attended a meeting on March 21, 2018 during which Waring Lester and Stan Roux reviewed her performance. *See* Doc. 12 at 28–30 (Am. Compl. ¶¶ 132–40). Plaintiff alleges that during this meeting she "[t]hwarted" Stan Roux by explaining that several of his concerns about plaintiff's performance were unfounded. *See id.* at 28–29 (Am. Compl. ¶¶ 135, 137–38). This was the same meeting where Stan Roux informed plaintiff that she was going on a "MPIP" performance improvement plan. *See id.* at 30 (Am. Compl. ¶ 141).

Plaintiff also alleges that she "initially requested an accommodation of an agenda and the ability to tape record her meetings, with [defendant] retaining the tapes so Plaintiff could address her short-term memory deficits" and "[w]ith accommodation, Plaintiff could have performed the essential functions of her job[.]" *Id.* at 35 (Am. Compl. ¶ 170).

If plaintiff proves these allegations as true, they would support a plausible finding or inference that plaintiff was a qualified individual. The Amended Complaint thus alleges sufficient facts to discharge plaintiff's pleading burden.

### 3. Adverse Employment Action

Defendant argues that "Plaintiff has not pled facts that, if true, would show that she actually suffered an adverse employment action." Doc. 14 at 6. Plaintiff responds that "a failure to accommodate is statutorily defined as disability discrimination" and that "a constructive

discharge is an adverse action."  Doc. 16 at 8 (citing *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004)).  An adverse action is one that produces "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742, 761 (1998).

The Amended Complaint asserts that "Plaintiff finally was forced into retirement because [defendant] failed to engage in a good faith interactive process or provide reasonable accommodations" after she "requested the ability to tape record certain meetings and an agenda for certain meetings consistent with Battle v. UPS."[10]  Doc. 12 at 32 (Am. Compl. ¶¶ 154–55). Plaintiff alleges that "without the accommodations, Plaintiff could not perform her job and was forced to retire."  *Id.* at 35 (Am. Compl. ¶ 170).  The Amended Complaint notes that "such accommodations were reasonable for one of her former Division Manager peers in Battle v. UPS," *id.* (Am. Compl. ¶ 167), and argues that plaintiff's requested accommodations "were reasonable, and [defendant] should be co[]ll[a]terally estopped from denying that Plaintiff's requested accommodations were, and are, reasonable," *id.* (Am. Compl. ¶ 168).  Defendant replies that despite the plaintiff's discussion of *Battle v. United Parcel Service, Inc.*, 438 F.3d 856 (8th Cir. 2006) and allegations about her doctor's involvement, "Plaintiff has not made allegations showing that the specific accommodations she requested—i.e. to have an agenda and to tape record meetings—were pursuant to a doctor's order, or were reasonable."  Doc. 19 at 4–5.

Defendant's failure to provide reasonable accommodations may serve as an adverse employment action.  *See Douglas v. Gen. Motors Corp.*, 982 F. Supp. 1448, 1452 (D. Kan. 1997)

---

[10]　　The Amended Complaint neglected to provide a full citation for this case, *see, e.g.*, Doc. 12 at 32, 35–36 (Am. Compl. ¶¶ 154, 167, 176), but plaintiff's responsive filing (Doc. 16) appears to clarify that this case refers to *Battle v. United Parcel Service, Inc.*, 438 F.3d 856 (8th Cir. 2006), *see* Doc. 16 at 6.

(Lungstrum, J.) (concluding that plaintiff satisfied the second element of an ADA retaliation claim by asserting that she suffered an adverse employment action based on defendant's "refusal to accommodate"). Given plaintiff's allegations about her requests for certain accommodations and defendant's decisions to deny those requests, the court concludes that plaintiff has alleged facts sufficient to plead she suffered an adverse employment action.

### 4. Causation

Defendant also suggests that the Amended Complaint (Doc. 12) fails to "establish a causal connection between her alleged disability or request for an accommodation, and any alleged adverse action." Doc. 14 at 6–7. Plaintiff responds that "[w]hen one considers Stan Roux's negative comments about the use of leave, as alleged in paragraph 7, there is more than enough evidence of disability discrimination." Doc. 16 at 8. Plaintiff is referring to her allegation that:

> On May 27, 2016, Plaintiff met with Stan Roux. They discussed future candidates for promotions. Stan spoke in a negative manner about John Jardes' disability and some of the issues [defendant] was having with his lack of intensity at work due to his disability and use of FMLA leave. After speaking negatively of Jardes' disability, Roux at one point of the conversation said to Plaintiff, "I don't know why he just doesn't retire."

Doc. 12 at 2 (Am. Compl. ¶ 7). Plaintiff further alleges that Stan Roux was generally hostile to accommodating persons with disabilities and sought to induce such employees to "to quit, go on long term disability or leave the company" without creating legal liability for defendant. *See id.* at 3–4 (Am. Compl. ¶ 15). Plaintiff alleges that she "was told to make sure [she] documented every violation of [defendant's] policy so that" another employee who had "taken several leaves of absence" "would have to quit, go on long term disability or leave the company" and "could not sue [defendant] for" ceasing to "accommodat[e] her with her disabilities." *Id.* Defendant notes that Stan Roux's comments alleged in ¶¶ 7 and 15 referenced other employees, not

plaintiff.  Doc. 19 at 4.  But plaintiff alleges that "as a matter of policy," defendant "attempts to quiet the victim by intimidation or just make them go away" "[i]nstead of dealing with the person who was the problem[.]"  *Id.* at 33 (Am. Compl. ¶ 161).  She alleges that defendant's "treatment of similarly situated Division Managers who did not have a disability or who had not requested a disability is circumstantial evidence of this policy."  *Id.* at 34 (Am. Compl. ¶ 162).  Plaintiff alleges that "Stan Roux[] has continued to refuse to allow persons with disabilities agendas and the ability to record[,]" *id.* at 35 (Am. Compl. ¶ 167), and "[a]fter she requested accommodation, Plaintiff was asked on several occasions why she didn't retire" and that "Stan Roux . . . asked Plaintiff when she intended to retire several times[,]" *id.* at 33 (Am. Compl. ¶ 160).

Viewing these facts in plaintiff's favor, the court concludes that plaintiff alleges sufficient facts to plead a causal connection between her disability or requests for accommodation and an adverse action.  The court thus denies defendant's motion to dismiss plaintiff's ADA and KAAD disability discrimination claim asserted in Count I.

### B.  Count II:  Retaliation Under ADA and KAAD

Defendant asks the court to dismiss plaintiff's claim for retaliation for opposing disability discrimination and requesting an accommodation because plaintiff fails to state a plausible ADA retaliation claim.  "To establish a prima facie case of ADA retaliation, a plaintiff must prove that (1) [s]he 'engaged in a protected activity'; (2) [s]he was 'subjected to adverse employment action subsequent to or contemporaneous with the protected activity'; and (3) there was 'a causal connection between the protected activity and the adverse employment action.'"  *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186–87 (10th Cir. 2016) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999)).  Defendant asserts that KAAD retaliation

claims require the same.  Doc. 14 at 7 (citing *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1205 (10th Cir. 2000)).

The court will first consider whether plaintiff alleges adequately that she engaged in a protected activity, and then proceed to consider her allegations about causation.

### 1.  Protected Activity

Defendant asserts that plaintiff's Amended Complaint lacks "factual averments that indicate she was opposing unlawful *disability* discrimination[.]"  Doc. 14 at 7.  Plaintiff never responds to this argument.  *See* Doc. 16.  But a plaintiff may engage in protected activity in several ways.  One way is requesting an accommodation.  *Foster*, 830 F.3d at 1187.  No magic words are required, but the employee must make clear that she seeks assistance for her disability.  *Id.* at 1188.  Here, plaintiff alleges that she "made several documented attempts to find a resolution for an ADA accommodation" and requested specific accommodations for her disability, *see, e.g.*, Doc. 12 at 32, 35 (Am. Compl. ¶¶ 154, 167, 170), and that "Defendant has retaliated against Plaintiff for . . . requesting accommodation[,]" *id.* at 36 (Am. Compl. ¶ 175).  Plaintiff's assertions sufficiently allege that she engaged in a protected activity.

### 2.  Causation

Defendant also argues that plaintiff's Amended Complaint fails to assert "that her treatment was in some way connected to her purported disabilities, or a request for accommodation."  Doc. 14 at 7.  Defendant similarly asserts that "while Plaintiff has made the conclusory assertion that she requested a reasonable accommodation, she has not made factual assertions showing a causal connection between her request, its denial, and her purported 'forced' retirement or any other alleged adverse action."  *Id.* at 8.

As discussed above, the Amended Complaint alleges that defendant "avoided [its] duty to accommodate persons with disabilities" by "attempt[ing] to quiet the victim by intimidation or just make them go away."  Doc. 12 at 33 (Am. Compl. ¶ 161).  Plaintiff alleges that defendant achieves this avoidance by "punish[ing] persons who request accommodations or leave by subjecting them to stricter scrutiny and disciplining them more harshly than employees who have not requested accommodation or filed an EEOC charge."  *Id.* at 36 (Am. Compl. ¶ 176).  As mentioned above, plaintiff also alleges Stan Roux's hostility to accommodating disabled employees.  *See id.* at 2 (Am. Compl. ¶ 7) ("speaking negatively of Jardes' disability"); *id.* at 3–4 (Am. Compl. ¶ 15) (directing an employee "to eliminate . . . accommodations . . . because he said [defendant] did not accommodate persons with disabilities" and directing plaintiff to "document[] every violation of [defendant's] policy so that Julie Stavely could not sue [defendant] for [eliminating her accommodation so] later [Stavely] would have to quit, go on long term disability or leave the company.").  Plaintiff alleges that, in her own circumstance, defendant "set[] her up to fail because Plaintiff had a disability and requested accommodation." *Id.* at 4 (Am. Compl. ¶ 17).  She alleges that defendant placed "her on a false performance improvement plan and refus[ed] to accommodate her," *id.* at 36 (Am. Compl. ¶ 175), while various similarly situated "Division Managers who never requested accommodation, engaged in a protected disability, or identified themselves as persons with disabilities" were "never placed . . . on a [performance improvement plan], even though their performance was the same or much worse than Plaintiff's[,]" *id.* at 34 (Am. Compl. ¶ 162).  Plaintiff alleges that this approach to disability was a matter of policy, *id.* at 33 (Am. Compl. ¶ 161) ("just make them go away"), and that her disparate treatment vis-a-vis "similarly situated Division Managers who did not have a disability or who had not requested a disability is circumstantial evidence of this policy[,]" *id.* at

34 (Am. Compl. ¶ 162).  And as noted above, plaintiff alleges that Stan Roux refused to grant

plaintiff's request for accommodations, *id.* at 35 (Am. Compl. ¶ 167), and also "asked Plaintiff

when she intended to retire several times[,]" *id.* at 33 (Am. Compl. ¶ 160).

These allegations, if proved true, are capable of supporting a finding or inference of ADA

retaliation.  Plaintiff thus has discharged her pleading burden and so, the court thus denies

defendant's motion to dismiss plaintiff's disability retaliation claims asserted in Count II.

### C.  Count III:  Retaliation and Interference under FMLA

Next, defendant argues that the court should dismiss Count III of the Amended

Complaint alleging FMLA claims because plaintiff has not pleaded any factual allegations to

back up her "threadbare assertions that her use of FMLA leave was a 'factor' in certain

employment decisions."  Doc. 14 at 11–12.  "'This circuit has recognized two theories of

recovery under [29 U.S.C.] § 2615(a):  an entitlement or interference theory arising from §

2615(a)(1), and a retaliation or discrimination theory arising from § 2615(a)(2).'"  *Dalpiaz v.

Carbon Cnty, Utah*, 760 F.3d 1126, 1131 (10th Cir. 2014) (quoting *Metzler v. Fed. Home Loan

Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006)).  "These two theories of recovery are

separate and distinct theories that 'require different showings[,] differ with respect to the burden

of proof,' and 'differ with respect to the timing of the adverse action.'"  *Id.* (quoting *Campbell v.

Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007)).

The next two subsections discuss these independent theories of FMLA violation.  The

first takes on the retaliation claim.  The second analyzes the interference theory.

#### 1.  FMLA Retaliation

A prima facie case of FMLA retaliation requires that:  (1) plaintiff engaged in protected

activity; (2) defendant took action that a reasonable employee would consider adverse; and (3) a

causal connection exists between the protected activity and the adverse action.  *Metzler*, 464 F.3d at 1170–71.

Defendant argues that plaintiff fails to allege causation.  *See* Doc. 14 at 12 ("[S]he puts forth no factual averments that, if true, would evidence a causal connection between exercise of . . . [her FLMA] rights and any purported action Defendant took related to her employment."). Plaintiff responds that the Amended Complaint alleges she engaged in a protected activity by requesting FMLA leave.  Doc. 16 at 11 (first quoting Doc. 12 at 21 (Am. Compl. ¶ 92); then citing Doc. 12 at 31–32 (Am. Compl. ¶¶ 149–150)).  Paragraph 92 of the Amended Complaint does allege "Plaintiff requested FMLA leave" in August 2017.  *Id.* at 21 (Am. Compl. ¶ 92), but ¶¶ 149–150 are not so explicit.[11]

Yet, even if the court assumes that ¶¶ 149–150 adequately allege that plaintiff requested FMLA leave in March of 2018, it remains unclear how those requests connect to defendant's *earlier* decision to place plaintiff on the MPIP—the event that plaintiff suggests was an adverse action.  *See* Doc. 16 at 10–11.  Plaintiff learned "that she would be put on the MPIP program" on March 21, 2018.  *See* Doc. 12 at 28–30 (Am. Compl. ¶¶ 132–41).  But the events described in ¶¶

---

[11]     Plaintiff responds that she "alleges requests for FMLA leave in paragraph 149 and 150."  Doc. 16 at 11.  But ¶ 150 merely alleges that plaintiff met with her psychiatrist who "again recommended Plaintiff seek accommodations for disability."  *See* Doc. 12 at 32 (Am. Compl. ¶ 150).  Paragraph 149 describes plaintiff's March 22, 2018 panic attack and concurrent phone conversations with her husband and Stan Roux, and asserts that "[t]his was timely and proper notice of the need for FMLA leave."  Doc. 12 at 31–32 (Am. Compl. ¶ 149).  Plaintiff cites *Been v. New Mexico Department of Information Technology*, a District of New Mexico case, presumably to imply that just like the *Been* defendants who "were on notice that Plaintiff might qualify for FMLA benefits when she first told them she was pregnant[,]" 815 F. Supp. 2d 1222, 1241 (D.N.M. 2011), so too was defendant here given "timely and proper notice of the need for FMLA leave[,]" Doc. 12 at 31–32 (Am. Compl. ¶ 149), by virtue of Stan Roux's phone conversations with plaintiff and her husband.  *See* Doc. 16 at 11 (citing *Been*, 815 F. Supp. 2d at 1241).  Because plaintiff already had made an explicit request for FMLA leave in 2017, the court need not resolve whether plaintiff's March 22, 2018 medical episode at the hotel and concurrent phone call with Stan Roux are indeed *Been*-like and could qualify as a FMLA "request" in our Circuit.

149–150 did not occur until the next day.  *Id.* at 31 (Am. Compl. ¶ 147).  So, causation between the adverse action and subsequent FMLA request is absent.[12]

Though the events described in ¶¶ 149–150 cannot have caused defendant's earlier decision to place plaintiff on the performance improvement plan, her August 2017 request for FMLA leave described in ¶ 92 did precede the March 2018 MPIP decision she complains of in the Amended Complaint.  Plaintiff supplements the mere sequential order of these two events by pointing to ¶¶ 162 and 177 of the Amended Complaint which, she asserts, "identifies other division managers who were not placed on a performance improvement plan, even though their performance was worse" and "then alleges the defining . . . difference was Plaintiff's request for FMLA leave[.]"  Doc. 16 at 11 (citing Doc. 12 at 34, 36 (Am. Compl. ¶¶ 162, 177)).  But, as defendant points out, these paragraphs "do not actually mention leave taken pursuant to the FMLA, exercise of rights under the FMLA, or the FMLA at all."  Doc. 19 at 10.[13]  No alleged facts in ¶¶ 162 or 177 suggest that the defendant's inconsistent treatment of plaintiff compared to other Division Managers might have been connected to a prior request for FMLA leave.  *See* Doc. 12 at 34, 36 (Am. Compl. ¶¶ 162, 177).  Indeed, her Complaint never alleges whether these other managers did or did not avail themselves of FMLA leave.  So, those allegations, if proved

---

[12]      Another of plaintiff's FMLA allegations suffers from a similar absence of facts supporting causation.  She alleges that "Plaintiff's use of FMLA leave was a factor in the decision to transfer the Plaintiff to the troubled Division."  Doc. 12 at 3 (Am. Compl. ¶ 11).  But, as defendant identifies, "Plaintiff does not actually allege that she took FMLA leave before her transfer, for any reason."  Doc. 14 at 12.

[13]      Plaintiff's response asserts that ¶ 162 "should" include language reciting that other Division Manager had not requested leave.  *See* Doc. 16 at 11 n.1.  But ¶ 162 does not say that.  And plaintiff does not ask the court for leave to amend under Federal Rule of Civil Procedure 15 to allege these facts.  As defendant asserts, plaintiff's attempt to amend her complaint in this way is improper.  Doc. 19 at 9.  So the court disregards what plaintiff asserts her Amended Complaint "should read[.]"  Doc. 16 at 11 n.1.

true, could not support a causation finding that plaintiff's FMLA leave caused defendant to place her on the MPIP.

Plaintiff also suggests that she alleges causation via the Amended Complaint's allegations about "the negative attitudes by Stan Roux in paragraph 7." Doc. 16 at 11. She asserts that "[o]ther courts have found this probative." *Id.* (citing *Miles v. Am. Red Cross*, No. 16-CV-20-JED-JFJ, 2017 WL 6503986, at *2 (N.D. Okla. Dec. 19, 2017)). In *Miles*, the Northern District of Oklahoma held that a supervisor's past directives that plaintiff "work on creating a 'paper trail' for other employees with restrictions that [the supervisor] no longer wanted to accommodate" and statements of intent to "use" those "paper trail[s]" helped support "a reasonable inference of pretext" in a wrongful termination suit where that same supervisor later "helped make the decision to fire" plaintiff. *Miles*, 2017 WL 6503986, at *2.

Here, plaintiff compares *Miles* to her allegation in ¶ 7 that "Stan [Roux] spoke in a negative manner about John Jardes' disability and some of the issues [defendant] was having with his lack of intensity at work due to his disability and use of FMLA leave. After speaking negatively of Jardes' disability, Roux at one point of the conversation said to Plaintiff, 'I don't know why he just doesn't retire.'" Doc. 12 at 2 (Am. Compl. ¶ 7). Plaintiff invites the court to treat Roux's "negative attitudes" like the active and repeated conduct that *Miles* noted. Doc. 16 at 11. The court declines. Plaintiff alleges no facts in ¶ 7 that show Stan Roux engaged in anything like the supervisor's conduct in *Miles*. *See* Doc. 12 at 2 (Am. Compl. ¶ 7).

Moreover, while plaintiff alleges in ¶ 7 that defendant "would eventually do the same thing to her" as defendant did to John Jardes, plaintiff does not allege in ¶ 7, or anywhere else in the Amended Complaint, that Jardes improperly was placed on a MPIP or otherwise subjected to the sort of retaliatory scrutiny and punishment that she suffered. Rather, plaintiff makes clear

that she and defendant's management thought that John Jardes was bad at his job.[14]  The court

accepts as true plaintiff's allegation in ¶ 7 that defendant did "the same thing to her" as John

Jardes, but this allegation doesn't link plaintiff's request for FMLA leave to the later adverse

actions she allegedly suffered.

Plaintiff has not directed the court to factual content showing that a causal connection

exists between her requests(s) for FMLA leave and the adverse actions culminating with her

forced retirement here.  *See* Doc. 16 at 10–11.[15]  Without more than threadbare assertions of

causation, the Amended Complaint does not plead facts plausibly capable of supporting a finding

or reasonable inference that defendant is liable for FMLA retaliation.

### 2. FMLA Interference

"To succeed on an interference claim, an employee must show that (1) [s]he was entitled

to FMLA leave, (2) an adverse action by h[er] employer interfered with h[er] right to take FMLA

leave, and (3) this adverse action was related to the exercise or attempted exercise of the

employee's FMLA rights." *Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1226 (10th Cir. 2012)

---

[14]     The Amended Complaint alleges that Lester thought Jardes "had basically burned the placed down[.]"  Doc. 12 at 2–3 (Am. Compl. ¶ 10).  Stan Roux said that plaintiff would be "cleaning up operations" in Jardes's former division.  *Id.* at 3 (Am. Compl. ¶ 12).  Plaintiff herself concluded, when she took over Jardes's "troubled Division" in 2016, that it "was in more trouble than expected . . . staffing was not adequate" and "the Division had no structure or organization at all."  *Id.* (Am. Compl. ¶¶ 11, 15).  "[S]taffing issues . . . had not been addressed by the previous Division Manager, John Jardes."  *Id.* at 10 (Am. Compl. ¶ 40).  "West Central had been the least-best noted in safety results in the District before [plaintiff] had taken it over."  *Id.*  (Am. Compl. ¶ 38).  And, "[t]here had been several incidents and pending legal matters that were left for the Plaintiff to deal with from the previous Division Manager John Jardes[.]"  *Id.* at 6 (Am. Compl. ¶ 25).

[15]     In other procedural contexts, courts have noted that it is not the court's job to search the record and make arguments for the parties.  *See Cordova v. Aragon*, 569 F.3d 1183, 1191 (10th Cir. 2009) ("It is not our role to sift through the record to find evidence not cited by the parties to support arguments they have not made."); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) (District courts "have a limited and neutral role in the adversarial process, and are wary of becoming advocates who comb the record . . . and make a party's case for it."); *cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

(citing *Metzler*, 464 F.3d at 1180).  Defendant asserts that plaintiff "has not pled sufficient facts

showing causation."  Doc. 14 at 11.  Plaintiff responds that ¶¶ 123–130 of the Amended

Complaint detail defendant's "actions holding her accountable while she was on leave" and those

actions represent "precisely the type of conduct that would render FMLA illusory."  Doc. 16 at

12.

     Paragraphs 123–130 are extremely difficult to follow.  The court endeavors to construe

the facts in the light most favorable to plaintiff, but is unable to decipher plaintiff's undefined

acronyms and imprecise references to unspecified events.  The court construes these paragraphs

to allege that plaintiff was subject to disparate treatment around February 5, 2018, *see* Doc. 12 at

26–27 (Am. Compl. ¶¶ 123–26), and that Karen Augustine told plaintiff that defendant was

"trying to pin this on Plaintiff and dig up things in her Division to try and demote her."  *Id.* at 27

(Am. Compl. ¶ 128).  These allegations do not mention FMLA or plaintiff's use of her FMLA

rights.[16]  Plaintiff asserts that ¶¶ 123–130 describe defendant's actions holding her accountable

"while she was on leave."  Doc. 16 at 12.  But these paragraphs instead appear to allege that

defendant held plaintiff accountable for decisions that stemmed from an investigation that

occurred "within Plaintiff's first few days back to work[.]"  Doc. 12 at 27 (Am. Compl. ¶ 125).

     The court thus finds that the facts alleged in ¶¶ 123–130 lend insufficient support for her

claim of FMLA interference and plaintiff generally has failed to respond to defendant's assertion

that plaintiff fails to allege facts showing that defendant's action was caused by plaintiff's

exercise or attempted exercise of her FMLA rights.  The court thus concludes that the facts

---

[16]    Plaintiff alleges that after she was "back to work . . . Plaintiff would leave early to see [the] doctor[,]" but does not suggest this was an exercise of her rights under FMLA.  Doc. 12 at 27 (Am. Compl. ¶ 125).

alleged do not enable a reasonable factfinder to draw a reasonable finding or inference that defendant is liable for FMLA interference.

In sum, the court dismisses plaintiff's FMLA retaliation and interference claims asserted in Count III for failing to state a plausible claim for relief.

### D.  Count VI:  Race Discrimination and Retaliation Under 42 U.S.C. § 1981

#### 1.  Race Discrimination

Defendant argues that "Plaintiff has not made any factual allegations that, if taken as true, establish that her race was a factor in any adverse employment decision or that she was treated differently because of her race" and that "it is not even entirely clear whether that is the claim she is advancing[.]"  Doc. 14 at 9.

##### a.  Associational Discrimination

Plaintiff's responsive brief (Doc. 16) appears to clarify that she is asserting an associational discrimination claim under the theory that where "an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's own race."  Doc. 16 at 13 (citing *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008)).  *Holcomb* held "that an employer may violate Title VII if it takes action against an employee because of the employee's association with a person of another race."  *Holcomb*, 521 F.3d at 132.  This out of Circuit case makes no mention of 42 U.S.C. § 1981.  But, the "elements of a racial discrimination case are the same under § 1981 as under Title VII."  *Manning v. Blue Cross & Blue Shield of Kan. City*, 522 F. App'x 438, 441 (10th Cir. 2013) (citing *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008)).  The "Tenth Circuit has recognized that a plaintiff may state a cause of action under 42 U.S.C. § 1981 for associational discrimination."  *Smith v. Century Concrete, Inc.*, No. 05-2105-

JAR, 2006 WL 1877013, at *3 n.20 (D. Kan. July 6, 2006) (citing *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1267 (10th Cir. 1989)).  Moreover, our court has held that a plaintiff "successfully alleged a cause of action under Title VII by claiming that he faced discrimination because of his interracial marriage."  *Id.* at *3.

Defendant replies that plaintiff has failed to plead adequately an associational racial discrimination claim.  Doc. 19 at 6.  Defendant asserts that, under *Trujillo*, "Plaintiff must make factual allegations that, if true, would show:  (1) the plaintiff was qualified for the job at the time of the adverse employment action; (2) the plaintiff was subjected to adverse employment action; (3) the plaintiff was known by her employer at the time to have a relative or associate of a protected class; (4) the adverse employment action occurred under circumstances raising a reasonable inference that the [race] of the relative or associate was a determining factor in the employer's decision."  *Id.* (citing *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1154 (10th Cir. 2008)).  Defendant argues that plaintiff has not pleaded facts to support that she is "qualified" (first element) or that "her marriage to a black man was a *determining factor* in any adverse employment action" (fourth element).  *Id.* at 7.

For reasons discussed above, the court finds that plaintiff has alleged sufficient facts that she was qualified, so the court considers whether plaintiff adequately has alleged that the adverse employment action here occurred under circumstances raising a reasonable inference that the race of plaintiff's relative or associate was a determining factor in the employer's decision.

Plaintiff alleges that she is "a white female married to a black man[.]"  Doc. 12 at 1 (Am. Compl. ¶ 1).  Her responsive brief (Doc. 16) directs the court's attention to the Amended Complaint ¶¶ 57, 192 and argues that these "allegations fall well within *Mahon*, and the Motion should be denied."  Doc. 16 at 13.  The court struggles to understand plaintiff's apparent

argument that her allegations in ¶ 57 apply to plaintiff's allegation that her husband is black, her claim of associational racial discrimination, or race generally.  Plaintiff alleges that "there was an incident with Kelly Ceesay, a white person, Nikki Spataro and Plaintiff" and Lester.  Doc. 12 at 14 (Am. Compl. ¶ 57).  The court recognizes that plaintiff mentions "a white person," but finds it irrelevant given everything else alleged about this encounter.  Even plaintiff's fuller descriptions of and references to this incident with Lester provide no suggestion that it involved race.  *See* Doc. 12 at 14, 16, 18–19 (Am. Compl. ¶¶ 56–57, 64–65, 74–79).  The only possible racial inkling the court can discern from this encounter emerges from plaintiff's allegation that on "April 27, 2017, Plaintiff spoke to Stan Roux about incident with Mr. Lester regarding his slurs." Doc. 12 at 19 (Am. Compl. ¶ 78).  The court notes plaintiff's use of the word "slur," but concludes that plaintiff alleges no facts about this interaction suggesting that ¶ 78 refers to a slur of the racial or ethnic variety.  *See* Doc. 12 at 14, 16, 18–19 (Am. Compl. ¶¶ 56–57, 64–65, 74–79).  Paragraph 192 of the Amended Complaint similarly makes no reference to plaintiff's husband and appears unrelated to a claim of associational discrimination.  *See id.* at 38 (Am. Compl. ¶ 192).

Defendant argues that while plaintiff "has alleged she is married to a black man, particularly fatal to this claim is the fact that there are no allegations—not even a conclusory statement stating as much—showing her marriage to a black man was a *determining factor* in any adverse employment action."  Doc. 19 at 7.  The court agrees.  Plaintiff alleges that "it became apparent to Plaintiff that Mr. Lester was prejudiced against white employees.  But Mr. Lester was initially 'okay' with Kelly Ceesay and Plaintiff since they had been married or were married to black men."  Doc. 12 at 7–8 (Am. Compl. ¶ 29).  As defendant identifies, plaintiff fails to make clear what the court is supposed to make of this allegation about Lester's prior

tolerance for women married to black men in light of plaintiff's claim of associational race discrimination.  The court concludes that plaintiff fails to plead a claim of associational race discrimination under 42 U.S.C. § 1981.[17]

### b.  Alternative Theories of Race Discrimination

In contrast to plaintiff's suggestion in her responsive brief (Doc. 16) that the race discrimination claim she brings is one for associational discrimination, the Amended Complaint alleges that "Plaintiff was subjected to stricter scrutiny, denied an accommodation, and forced to retire in violation of 42 [U.S.C. §] 1981 because she was white . . . ."  Doc. 12 at 38 (Am. Compl. ¶ 192).  Defendant argues that "Plaintiff has not made any factual allegations that, if taken as true, establish that her race was a factor in any adverse employment decision or that she was treated differently because of her race."  Doc. 14 at 9.  So, defendant asserts, plaintiff's "claim of race discrimination is missing a key—if not the key—element:"  facts that "would allow an inference that her *race* was a factor in th[e] treatment" plaintiff complains of.  *Id.*

But the Amended Complaint alleges a number of facts about race influencing employment decisions at her workplace.  Many of these involve Waring Lester, defendant's Operations Manager.  For example, she alleges:  "There were many incidents that were displayed in which it became apparent to Plaintiff that Mr. Lester was prejudiced against white employees."  Doc. 12 at 7–8 (Am. Compl. ¶ 29).  During plaintiff's May 31, 2016 meeting with Lester, he "began to make troubling discriminatory comments."  *Id.* at 2 (Am. Compl. ¶ 10).  Later, Lester said that he wanted "to right the wrong for the fairness with African Americans that [defendant] had wronged" and "suggested that the white male good old boys were part of the

---

[17]     To the extent that the court could construe Count IV of plaintiff's Amended Complaint as a claim under Title VII, the court concludes that plaintiff also has failed to state a claim for associational race discrimination under that statute.

issues." *Id.* at 4 (Am. Compl. ¶ 16).  Before long, "it became apparent that Mr. Lester favored

lesser qualified black folks." *Id.* at 7 (Am. Compl. ¶ 29).  Lester had sought to replace Jeff King,

plaintiff's "strongest Manager[,]" with "Wardell Hooks, an African American Manager" who

"was not deemed a strong Manager" and allegedly "made inappropriate advances toward a"

female employee, or "Gary Allen, another African American Manager" who was the subject of

"controversy and complaints . . . ." *Id.* at 6–7 (Am. Compl. ¶¶ 26–27, 29).  And, Lester said to

plaintiff, "'I am here to right the wrong of African Americans that have been discriminated

against and should have been promoted.'" *Id.* at 7 (Am. Compl. ¶ 29).

Plaintiff also alleges she "is a white female married to a black man" and "Lester was

initially 'okay' with" her because she was married to a black man.  Doc. 12 at 2, 8 (Am. Compl.

¶¶ 5, 29).  "Kelly Ceesay, a white person" similarly benefited from Lester's knowledge of her

marriage to a black man.  *Id.* at 7–8, 14 (Am. Compl. ¶¶ 29, 57).

Lester asked plaintiff "to drive to St. Louis and meet with him on March 21, 2018[.]" *Id.*

at 28 (Am. Compl. ¶ 132).  She alleges that during this meeting with Lester and Roux, Lester

"asked Plaintiff when she planned to retire" and Roux "inform[ed] her that she would be put on

the MPIP program . . . ." *Id.* at 30 (Am. Compl. ¶¶ 140–41).  Plaintiff alleges that she "was

placed on a MPIP under circumstances similarly situated black males . . . were not" and

"outperformed other Division Managers, yet she was disciplined and forced into retirement, and

they were not." *Id.* at 38 (Am. Compl. ¶¶ 191–92).

Viewing all these factual allegations as true and in plaintiff's favor, the court concludes

that plaintiff has alleged sufficient facts to allow for a reasonable inference that defendant is

liable for race discrimination.  The court thus rejects defendant's argument that plaintiff has

failed to state a § 1981 claim for race discrimination.

### 2.  Race Retaliation

Count IV of plaintiff's Amended Complaint asserts that plaintiff is a victim of racial retaliation in violation of 42 U.S.C. § 1981.  Doc. 12 at 38 (Am. Compl. ¶¶ 191–92).  The "'showing required to establish retaliation is identical under § 1981 and Title VII[.]'"  *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011) (quoting *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1110 (10th Cir. 1998) (quotation marks omitted)).

To state such a retaliation claim, a plaintiff must allege:  "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."  *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (citations and footnote omitted).  "Protected opposition can range from filing formal charges to voicing informal complaints to superiors."  *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004) (citation omitted).  Defendant asserts that plaintiff's race retaliation claim fails for want of allegations about (1) protected activity, and (2) causation.

### a.  Protected Activity

Defendant asserts that there "can be no retaliation when Plaintiff did not actually engage in protected activity."  Doc. 14 at 10 (citing *Weems v. Kan. Masonic Home*, No. 19-1046-EFM-TJJ, 2019 WL 3066457, at *3 (D. Kan. July 12, 2019)).  Defendant argues that "Plaintiff cannot establish retaliation under the theory that she opposed race discrimination" because aside from "a conclusory allegation stating that she did so, Plaintiff does not make any factual assertions that, if taken as true, would show that she actually opposed race discrimination."  *Id.*  The court agrees.

Plaintiff emphasizes her interaction[18] with Lester and Roux about their desired or actual promotion of non-white employees who were under-experienced, "lesser qualified[,]" or otherwise unfit for the given promotion.  *See* Doc. 16 at 15–16 (quoting Doc. 12 at 7–8 (Am. Compl. ¶¶ 28–29)).  While plaintiff offers conclusory assertions that she "opposed" racial discrimination, *see, e.g.*, Doc. 12 at 6–7 (Am. Compl. ¶¶ 26, 28), defendant asserts correctly that the "only facts alleged are that Plaintiff is 'concerned' about or 'objected' to the promotions of an Asian employee and African-American employees, and did so based entirely on the fact that she did not think these candidates were a good fit for the positions to which they were to be promoted.  She does not allege that she raised issues about racial discrimination or disparate treatment of white people."  Doc. 19 at 8 (citations omitted).

Plaintiff suggests that various out of Circuit cases make clear that "'opposition' [to race discrimination] can be passive."  Doc. 16 at 17 (citations omitted).  Plaintiff asserts that she "opposed the unwarranted removal of a high performing caucasian with an African-American who was not a strong manager and [had] a history of sex discrimination."  Doc. 16 at 16 (citing Doc. 12 at 6 (Am. Compl. ¶ 26)).  But even this example is insufficient.  This moment of alleged opposition to racial discrimination occurred during plaintiff's conversation with Lester about his desire to correct for past wrongs by advancing black employees.  Lester told her, "I am here to right the wrong of African Americans that have been discriminated against and should have been promoted."  Doc. 12 at 7 (Am Compl. ¶ 29).  In response, plaintiff told Lester that his declaration "was okay with Plaintiff, but that was not the case with these two (2) individuals."  *Id.*

---

[18]     The Amended Complaint fails to specify when these events occurred.  These paragraphs are bracketed by other paragraphs that reference dates in late 2016.  *Compare* Doc. 12 at 6 (Am. Compl. ¶ 25) ("October 17, 2016"), *with* Doc. 12 at 8 (Am. Compl. ¶ 32) ("November 6, 2016").  The court thus assumes that plaintiff's conversations with Lester and Roux alleged in ¶¶ 28–29 occurred between October 17, 2016 and November 6, 2016.

Plaintiff implies that her response to Lester qualifies as opposing racial discrimination. Doc. 16 at 15–16 (quoting Doc. 12 at 7–8 (Am. Compl. ¶¶ 28–29)). But no reasonable jury could find or infer that plaintiff's alleged statement to Lester *opposed* discrimination. *Argo*, 452 F.3d at 1202 (requiring a retaliation plaintiff to engage in "opposition to discrimination"). Contrary to this requirement, plaintiff has alleged that she "was okay with" his scheme to favor black employees over white employees. Doc. 12 at 7 (Am. Compl. ¶ 29) ("that was okay with Plaintiff"). Plaintiff opposed not Lester's race-influenced decision making, but rather the notion that Hooks and Allen actually satisfied Lester's stated qualifications. *See id.* ("[1] have been discriminated against and [2] should have been promoted"). The Amended Complaint shows both the reasons why Hooks and Allen were not employees who "have been discriminated against and should have been promoted" and plaintiff's efforts to convey those reasons to Lester. *See id.* at 6 (Am. Compl. ¶ 26) ("Plaintiff told Mr. Lester that this was not a good idea since Wardell was not deemed a strong Manager."); *id.* at 7 (Am. Compl. ¶ 29) ("Plaintiff told [Lester] that it was not a good idea with all the controversy and complaints that had been made about Gary Allen."). These alleged comments to Lester did not implicate race. *See Robinson v. Dean Foods Co.*, 654 F. Supp. 2d 1268, 1283–84 (D. Colo. 2009) (granting summary judgment for defendant where "no reasonable fact finder could find in favor of the plaintiff on . . . her claim of . . . retaliation" because her "complaint [to human resources manager] does not implicate race, sex, or other unlawful discrimination and, thus, is not protected opposition to discrimination" (citing *Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008))).

Plaintiff also asserts that her objection to Lester's April 20, 2017 comments to plaintiff, Kelly Ceesay, and Nikki Spataro constituted "protected activity[.]" *See* Doc. 12 at 14, 18 (Am.

Compl. ¶¶ 57, 74).  As discussed above, plaintiff simply alleges no facts showing that she opposed *racial* discrimination during or due to this encounter.

The court is mindful that the Amended Complaint seasons its allegations with several conclusory statements that plaintiff "opposed" racial discrimination.  But these statements are no more than conclusions, and they don't qualify as the kind of factual allegations that plaintiff must make to support her claim.  And the facts she does allege fail to show any such opposition to racial discrimination.  Plaintiff fails to allege that she engaged in protected activity, one of the three elements necessary for a race retaliation claim.  The court thus grants defendant's motion to dismiss plaintiff's § 1981 retaliation claim.

## IV.     Defendant's Motion for a More Definite Statement

As an "alternative to dismissal of Plaintiff's Complaint in its entirety, Defendant asks this Court to order Plaintiff to amend her [Amended] Complaint to provide clear, concise, and intelligible factual allegations in support of any claims that this Court does not dismiss as required by Fed. R. Civ. P. 8."  Doc. 14 at 14 (citing *Ewing v. Andy Frain Sec. Co.*, No. 11-CV-02446-JAR-DJW, 2012 WL 162379, at *2 (D. Kan. Jan. 19, 2012)).  Defendant argues that the Amended Complaint "is still so rife with vague, confusing, and unintelligible allegations that Defendant cannot respond to it as currently pled."  *Id.*  Plaintiff responds that the court should deny the motion because "the Amended Complaint sets forth the necessary allegations to state a claim against the Defendant and . . . any perceived deficiencies . . . can be ferreted out in discovery."  Doc. 16 at 19 (citing Fed. R. Civ. P. 8 & 12(e)).

## A.  Legal Standard Governing Rule 12(e)

A party may move for a more definite statement under Federal Rule of Civil Procedure 12(e) when the complaint is "so vague or ambiguous that the party cannot reasonably prepare a

response."  Rule 12(e) motions generally are disfavored and "are properly granted only when a party is unable to determine the issues" to which he must respond.  *Res. Tr. Corp. v. Thomas*, 837 F. Supp. 354, 356 (D. Kan. 1993).  "Requiring a more definite statement is appropriate when addressing unintelligible or confusing pleadings."  *Suede Grp., Inc. v. S Grp., LLC*, No. CIV.A. 12-2654-CM, 2013 WL 183752, at *1 (D. Kan. Jan. 17, 2013) (citations omitted).

"A motion for more definite statement should not be granted merely because the pleading lacks detail; rather, the standard to be applied is whether the claims alleged are sufficiently specific to enable a responsive pleading in the form of a denial or admission."  *Advantage Homebuilding, LLC v. Assurance Co. of Am.*, No. 03-2426-KHV, 2004 WL 433914, at *1 (D. Kan. Mar. 5, 2004).  Also, a party cannot invoke Rule 12(e) as a method of pretrial discovery. *See Hix Corp. v. Nat'l Screen Printing Equip., Inc.*, No. 00-2111-KHV, 2000 WL 1026351, at *1 (D. Kan. July 6, 2000) (denying motion for more definite statement because "the appropriate method to determine more specific information about the allegations is through the discovery process"); *see also Advantage Homebuilding*, 2004 WL 433914, at *1 (explaining that Rule 12(e) motions are disfavored "in light of liberal discovery available under the federal rules"). The decision whether to grant or deny a motion for more definite statement lies within the sound discretion of the court.  *Graham v. Prudential Home Mortg. Co., Inc.*, 186 F.R.D. 651, 653 (D. Kan. 1999).

**B.  Discussion**

Defendant argues that plaintiff's Amended Complaint "is so vague, confusing, and unintelligible that Defendant cannot respond to the allegations with an admission or denial as required by Fed. R. Civ. P. 8(b)."  Doc. 14 at 13.  Defendant also argues that "[i]n addition to relying on 'factual' allegations that are better described as an unclear and unintelligible stream-

of-consciousness, Plaintiff makes her allegations even more confusing by using terms and acronyms that are vague and undefined.  She then proceeds to make additional allegations related to those vague and undefined terms and acronyms as if Defendant (and the Court) is supposed to know what they mean" and "at no point does she define or otherwise describe these terms and acronyms such that Defendant could actually determine the appropriate response to the allegations about them."  *Id.* at 13–14.  Defendant also asserts that, "[d]espite being extremely verbose, the Complaint contains only the barest of facts regarding any of the alleged claims; truthfully, without the Counts providing the most general description of the claims alleged, Defendant would not know what claims it is required to defend against."  *Id.* at 13.

Plaintiff responds that, "[a]t bottom," defendant's argument for moving under Rule 12(e), is the claim that defendant "does not know the meaning of abbreviations used every day in its corporate culture."  Doc. 16 at 18.  Plaintiff suggests that it is "beyond amazing that [defendant] claims it[] does not know what a preloader is or a 'd-day' is.  Arguing that [defendant] does not know what these abbreviations means strains credulity.  But it is not a basis for a more definite statement."  *Id.*

Federal Rule of Civil Procedure 8(a)(2) instructs that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Here, plaintiff's method of pleading has complicated the court's effort to understand her Amended Complaint.  The issue is not want of detail, but of comprehensibility.  The filing's tendency to venture down tangential and achronological paths comes at the cost of clarity.  The way that plaintiff has presented her claims in her Amended Complaint has required the court to parse through its 40 pages of allegations to try to deduce from context who is whom, what happened when, and the meaning of UPS-specific jargon.  Unclear allegations, inconsistent and undefined nomenclature,

and apparently erroneous dates compound the other errors.  The court has endeavored, but has struggled, to make sense of it all.

The court concludes that both parties and the court itself would benefit from a more definite statement of plaintiff's remaining claims (those in Count I, Count II, and Count IV's race discrimination claim under § 1981).  The court thus orders plaintiff to file a Second Amended Complaint—one that cures the deficiencies identified in this Order—within 20 days of this Order's date.

## V. Conclusion

For the reasons above, the court grants the Motion to Dismiss for Count III (FMLA interference and retaliation) and the associational race discrimination and race retaliation claims under Count IV of the Amended Complaint.  The court also grants the Motion for More Definite Statement for Count I (ADA and KAAD disability discrimination), Count, II (ADA and KAAD disability retaliation), and the race discrimination claim under Count IV.  While the federal courts disfavor motions under Rule 12(e), the Amended Complaint is the exception to that general rule.

**IT IS THEREFORE ORDERED THAT** defendant's Motion to Dismiss (Doc. 13) is granted in part and denied in part.  The motion is granted for Count III and the association and retaliation claims under Count VI consistent with this Memorandum and Order.  The court denies the motion to dismiss in all other respects.

**IT IS FURTHER ORDERED THAT** defendant's Motion for More Definite Statement (Doc. 13) is granted for Count I, Count II, and the race discrimination claim under Count IV, consistent with this Memorandum and Order.  Plaintiff shall file with the court a Second Amended Complaint in accordance with this Order within 20 days.

**IT IS SO ORDERED.**

**Dated this 29th day of September, 2020, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
