**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

**SUSAN NORWOOD**                                                                        **PLAINTIFF**

**v.**     **NO. 2:19-cv-02496DDC**

**UNITED PARCEL SERVICE, INC.**                                              **DEFENDANTS**

<u>**SECOND AMENDED COMPLAINT**</u>

COMES NOW, Plaintiff, Susan Norwood, by and through counsel, **SUTTER & GILLHAM, P.L.L.C,** and for this Second Amended Complaint states:

<u>**Parties**</u>

**1.**     Plaintiff, Susan Norwood was at all times relevant a resident of Kansas, who started working for UPS on September 1, 1986.

**2.**     Defendant United Parcel Service is a for-profit, corporation, doing business in an industry substantially impacting interstate commerce and employing more than 500 people in the state of Kansas during each week in 2017, 2018, and 2019 with its principal place in Georgia. Defendant is a federal contractor subject to OFFCP regulations.  The events leading to this lawsuit took place in Kansas.  Venue is proper under 28 USC 1391(b), and this Court has federal question subject-matter jurisdiction under 28 USC 1331, as well as supplemental jurisdiction under 28 USC 1367 and diversity jurisdiction under 28 USC 1334.

**3.**     This is an action for violation of the Kansas Act Against Discrimination and the Americans with Disabilities Act of 1990 in the form of disability discrimination and retaliation brought in an amount exceeding that required for diversity jurisdiction.

**4.**     Thus, this Court has personal and subject matter jurisdiction over these issues, and venue is proper.  Plaintiff timely filed a charge of discrimination with the EEOC  and the State of Kansas in July of 2018.  She now files this action within ninety (90) days of receiving her right to sue letter, attached as <u>**Exhibit "A.**</u>"

<u>**GENERAL ALLEGATIONS OF FACT**</u>

**5.**     Plaintiff started working for Defendant in 1986.  She is a white female married to a black man.

**6.**     At all times relevant, Plaintiff has performed her job satisfactorily until she was forced to retire in 2019 upon threat of termination.

**7.**     On May 27, 2016, Plaintiff met with Stan Roux. They discussed future candidates for promotions.  Stan spoke in a negative manner about John Jardes' disability and some of the issues UPS was having with his lack of intensity at work due to his disability and use of FMLA leave.  After speaking negatively of Jardes' disability, Roux at one point of the conversation said to Plaintiff, "I don't know why he just doesn't retire."  Unbeknownst to Plaintiff, UPS would eventually do the same thing to her.

**8.**     On May 31, 2016, Plaintiff was flown to St. Louis to meet with Mr. Waring Lester, Operations Manager and Stan Roux, Human Resources Manager. In this meeting Plaintiff was asked if she would take the Division Manager's job in KC building. West Central Division. UPS was moving John Jardes to West Division, which was the Plaintiff's Division at the time.

**9.**     Stan said that since Plaintiff's Division was running so well, and that Plaintiff had groomed Reuben Logan to be the next Division Manager even if John wasn't there much, Reuben would keep the Division together.

**10.**    Mr.  Lester had not been in the District long when this decision was made.  During this meeting, Mr. Lester began to make troubling discriminatory comments. At the time of the meeting with the Plaintiff, Mr. Lester stated that it was not his idea to put Plaintiff in the KC Building.  Mr. Lester stated he didn't feel it was fair since John Jardes had basically burned the placed down and now UPS were going to send Jardes to a Division running well, leaving Plaintiff had to start over.

**11.**    Stan stated, it was closer to home for Plaintiff and since Plaintiff had some medical issues with her parents, UPS management felt like it would be easier for her.

12.     Plaintiff commented, "Just for the record, I have never requested to be taken off the road."   Stan Roux agreed, then he said, "This is what you're good at, cleaning up operations.   We will give you all the support you need." Plaintiff said, to both of them, that the West Central Division was a tough Division.

13.     Since Plaintiff had cut her teeth in that building as a young Supervisor and was promoted in that building as a Manager, she felt like she could fix it with UPS' support, even though it was the "Most Help Needed" Division in the District.

14.     On June 1, 2016, Plaintiff started in the KC Building. Plaintiff met with John Jardes. Plaintiff took him through all of her A.M. Meeting agenda's, Daily role ups, QIP Process, her action plans, Strat plans and Trend graphs.  Plaintiff turned to him and asked what he had. He said, " I got nothing. Whatever you did in West Division you should do here, and you will be fine." John turned and left the office.

15.     For the rest of the week, Plaintiff met with each Manager and Supervisor to see who, and what, they were about and determined that the Division was in more trouble than expected. Plaintiff determined her staffing was not adequate going into UPS' peak season. Plaintiff also concluded the Division had no structure or organization at all.    As an example, Plaintiff had been dealing with people in wrong positions. Julie Stavely was put in Safety because she had taken several leaves of absence. John Jardes put her in Safety as a way of accommodating her with her disabilities. John Jardes had also made accommodations for Kevin Garcia. Stan Roux sent Rebecca Aciego down to eliminate these accommodations while Plaintiff was the Division Manager because Stan said UPS did not accommodate persons with disabilities. Plaintiff was told to make sure Plaintiff documented every violation of UPS policy so that Julie Stavely could not sue UPS for moving her back into an operation position in which later she would have to quit, go on long term disability or leave the company.

16.     Plaintiff spoke several times to District Manager, Fern Shaw, regarding the status of the Division. Fern advised Plaintiff that the people in the Division were broken because the Division previously had poor leadership and that the Plaintiff needed to make it fun for employees in the Division to come to work again.  But UPS ultimately failed to support the Plaintiff, instead setting her up to fail because Plaintiff had a disability and requested accommodation.

17.     On June 6, 2016, Plaintiff flew to Ontario, California, for a Dispatch Workshop with Kari Jo Allen. Fern Shaw had chosen her and Plaintiff since they had the best DPS plans in the District consecutively. This was prior to coming to West Central Division. However, this left the Division unattended, so Plaintiff was unable to begin creating the structure that was needed so desperately in her Division.

18.     On October 12, 2016, Plaintiff received a phone call informing her that her Mother had had a seizure. Plaintiff was attending a meeting in St. Louis at the time. Plaintiff drove back to Kansas City, arriving back home late. Plaintiff drove straight to the Hospital. Mr. Lester had instructed Plaintiff to text him to let him know Plaintiff made it back safe.   Fern Shaw sent several text messages to the Plaintiff during the time she was dealing with her family emergency concerning her mother.

19.     Plaintiff gave reasonable notice of her need for leave.  On October 13, 2016, she text UPS about her mother's health.   Fern Shaw sent a reply text to Plaintiff, " Your heart will guide you. Let me know if there is anything that I can do. I am here for you." UPS responded, "take as much time as you need, take care of your family."

20.     Plaintiff's mother was eventually diagnosed with low brain capacity. The doctors were not sure if Plaintiff's mother would be able to continue to swallow. Plaintiff was her mother's POA and is the decision maker for Plaintiff's parents. The Plaintiff's family had to determine if they were going to put her on Hospice or not. Plaintiff's entire family was in denial. It was a very difficult time for Plaintiff, as well as a stressful time. The Plaintiff, and

her family, eventually decided to send her mother back to the nursing home.  Nonetheless, Plaintiff continued to work, even though her mother had a serious health condition.

**21.**      As an example, on October 17, 2016, Plaintiff received a text from District Manager, Fern Shaw, asking her to confirm whether or not she had spoken to On-Road Supervisor, Julia Lewis. Plaintiff was made aware of a situation with Julia Lewis that involved Facebook, text messages from a driver's wife, and allegations that had been made that were upsetting to Julia Lewis. This apparently started before Plaintiff had been transferred to the Division. Plaintiff reached out to Rebecca Aciego for her to visit with Julia on this situation. There had been several incidents and pending legal matters that were left for the Plaintiff to deal with from the previous Division Manager John Jardes, and this was one such situation.

**22.**      On November 6, 2016, Plaintiff's father had another heart attack. He underwent a procedure at Providence St. Margaret Hospital.  In all the years, Plaintiff had worked at UPS, this was the most stressful peak season for her. Plaintiff did not have enough drivers staffed.  As a matter of fact, Driver Supervisors had to deliver almost every day in violation of the labor contract. Plaintiff expressed her concerns about the shortage numerous times during the weekly District Staffing calls.  Plaintiff was short pre-loaders every day in the Kansas City building. This contributed to part-time supervisors having to load cars daily. This created the lack of ability to train pre-loaders quickly enough to perform the job. Drivers came in and worked to help get their cars loaded, and Plaintiff told Stan Roux about this practice.

**23.**      Plaintiff did not miss any work during this time. Fern Shaw would text Plaintiff daily and go through Helper Plan. She was fully aware that Plaintiff had concerns with hiring enough helpers. On December 16, 2016, for instance, Plaintiff text Fern Shaw stating they had given PCM to drivers to help recruit more helpers to assist Human Resources. *Nonetheless, the good news was that the Plaintiff's division had beaten last years' cost by*

*4.2 cents on a plan by 3.8 cents.* Fern Shaw would end most calls with her famous saying during peak. "Keep calm and have fun."

24.     On December 18, 2016, after a day when the building had difficulty running due to weather.  Plaintiff sent a text to Fern Shaw at 6:45 p.m. that read "I just want you to know I am not calm, nor having fun...I am depressed." Fern Shaw's response at 6:56 pm was "LOL".

25.     Plaintiff was serious.  Her depression had caused her to be unable to remember items as she once did and was causing her to be substantially limited in her ability to think, concentrate, and sleep.

26.     From January 9, 2017 to January 13, 2017, Tom Vanleer, Region Health and Safety Manager, came to visit the facility.  During this time, the Managers and Plaintiff were going to St. Louis for the District Health & Safety Council Meeting. This was surprising to the Plaintiff since all her Managers would be in St Louis. West Central had been the least-best noted in safety results in the District before she had taken it over. Plaintiff first learned this when the Region Manager, along with the staff, had gone through a few notes from the previous visit that they had completed when John Jardes was the Division Manager.

27.     During the January 10, 2017 and January 12, 2017 District Health and Safety Meetings, Plaintiff was able to Speak to Tom Vanleer, Region Occupational Health and Safety Manager. He said that during the interviews with the hourly Safety Company Chairs he was impressed that the attitudes were great and that they felt they had the time and support to make Kansas City a safe environment.  Tom Vanleer then told the Plaintiff that, generally, this is not the case when they do an audit of this nature on the least-best operations.

28.    Plaintiff explained to him that she had not been in the Division but six (6) months. Three (3) of those months were spent trying to survive peak with the staffing issues that had not been addressed by the previous Division Manager, John Jardes.

29.    Tom Vanleer and Eddie Louisea both told the Plaintiff, and the Management Team, they could see a difference in the attitudes of the Employees. Tom and the Plaintiff discussed changing the current Health and Safety Supervisor, Julie Stavely, to a different position. The Plaintiff and Tom Vanleer both felt Julia Lewis would be a better fit. Julie Stavely was not a good fit for that position and Stan Roux agreed with Plaintiff when the Plaintiff discussed it with him. The Plaintiff had several write ups from Julie Stavely indicating her lack of efficiencies regarding the safety position.  Stan Roux told Plaintiff was important for her to create a paper trail on Julie Stavely so that UPS could defend an ADA issue. Stan told Plaintiff she needed to show on record her performance with her job requirements. The Plaintiff reviewed these documents with Stan Roux so there would be no cause for any concerns by her being removed from that position.

30.    On February 2, 2017, Plaintiff took a day off to get a pap-smear. Plaintiff had Cervical Cancer in February of 2008; and, this was a routine follow up. Plaintiff had also gone to see Dr. Vassa for a colonoscopy consult. These were all routine physicals that were done annually. The Plaintiff generally scheduled these appointments in November every year. However, since the Plaintiff was transferred to the new division, there were many activities that prevented her from making those appointments.

31.    On February 8, 2017 and February 9, 2017, Plaintiff drove to St. Louis for a District Safety Council Meeting.

32.    On February 13, 2017, Plaintiff had a routine Mammogram and Colonoscopy procedure.

33.    On February 20, 2017, Plaintiff received results of her pap-smear. Her physician was concerned that her cancer may have returned. Plaintiff was emotional and depressed.

Plaintiff called Mr. Lester and asked to go home.  Plaintiff was crying and visibly upset with news.

**34.**     On February 24, 2017, Plaintiff took a D-Day to obtain a biopsy at Dr. Wilson's office to check for the return of cancer.

**35.**     On February 28, 2017, there was a Safety Head to Head with Steve Ricci. Steve Ricci and Plaintiff reviewed her Team's Safety Plans and Structures. He took Plaintiff through the Heat Map, which indicates if an operation is improving or getting worse with respect to injuries and crashes. The Division had shown improvements in some areas but stayed stagnant in others. Plaintiff explained her challenges in staffing and the ability to have supervisors available to adequately train.

**36.**     Plaintiff explained to Steve Ricci that they had several management spots open throughout the Division.  During the first twelve (12) months, Plaintiff had a vacancy of three (3) Managers, with seven (7) Supervisors new to their jobs.  Manager, Ron Dodge, of Jefferson City and Rolla was out for almost a year with health problems. It took almost six (6) months to replace him. He had a Supervisor that was out for almost a year in Jefferson City that had medical issues that never returned. That left only two (2) supervisors to run that center, one (1) of the supervisors were brand new.

**37.**     During this time the full time Manager, Jeff King, was removed from pre-load. They replaced him with Wardell Hooks, who was not a strong Manager. Plaintiff lost Julie Stavely to disability and Mike Bayers to disability on pre-load. They were both replaced with new FT Supervisors that needed to be trained. Plaintiff had to replace six (6) On-Road Supervisors for Special Assignments, Disability, Promotions, etc. This was very challenging as Plaintiff approached starting the largest Saturday ground delivery operation yet to be started in the District.

**38.**     Steve Ricci and Plaintiff discussed the continued challenges of Union Steward, Bryan Rooney, who had been recruiting lawsuits from anyone who had been hurt on-the-

job. He told Plaintiff not to get discouraged since UPS had changed the way the frequencies worked now.

39.     As an example, it takes a longer time than 12 months to get incidents to drop off to show better frequencies. Richie said he had tried to explain to those above his pay grade that it takes time to build a Safety Culture and to not get discouraged. Plaintiff had made steps in the right direction by changing the Safety Supervisor for the Division as well. Julia Lewis was very engaged, more so than the previous Supervisor that John Jardes put in charge of Safety.

40.     On March 2, 2017, Plaintiff received news that biopsy was not cancer. The cells were showing at risk. Dr. Wilson said it could be due to stress. Dr. Wilson had started Plaintiff on medication.  Plaintiff was scheduled for a stress test to determine if a serious health condition was present because heart attacks run in her Family,

41.     From March 11, 2017 to March 19, 2017, Plaintiff took vacation. During this time, on March 13, 2017, Plaintiff underwent a stress test with Dr. Green at SMMC. Plaintiff had been having migraines and not sleeping at night.    Plaintiff started becoming depressed.

42.     On March 22, 2017, Plaintiff reportedly was suffering a migraine and was going home. The migraines interfere with Plaintiff's ability to think, concentrate, and sleep and substantially limits these major life activities.   However, Plaintiff texted Stan Roux to discuss an employment situation with Jimmie Parr, a Manager, who has had multiple situations with safety infractions, failed audits, and improper disposal of hazardous materials. Stan Roux agreed that UPS needed to meet with Jimmie Parr to document, again, the severity of the situation(s). Plaintiff and Stan Roux had even discussed his loss of raise and possible demotion.  Mr. Roux did not criticize Plaintiff or her job performance during this conversation.  Plaintiff continues to have these issues concentrating and think today.  At a later date, Stan Roux would recommend that Plaintiff participate in the EAP program.

43.     On August 10, 2017, Plaintiff's father went to the doctor's office, where they subsequently rushed him to the hospital.   Plaintiff requested FMLA leave because her father who had been rushed to the hospital, was critical on August 11, 2017.  Plaintiff had a review of a previous audit finding with the region HR Manager and Plaintiff left shortly after that to be with her father.  Plaintiff was increasingly becoming more depressed.

44.     On August 11, 2017, there was a Review with UPS' Region HR Manager.  In that meeting, Plaintiff advised UPS that Plaintiff's father was also in the hospital, they were going to have to do a lung procedure. He had too much fluid in his lungs and his kidneys were failing.

45.     August 14, 2017, Plaintiff's father had a lung procedure. Plaintiff took a make up day from working the 1st Saturday implementation.

46.     On August 15, 2017, her father had surgery, Plaintiff took a make up day day for working the second Saturday of implementation.

47.     On August 25, 2017, Plaintiff had a follow-up pap-smear to check on cancer cells with physician, Dr. Wilson.

48.     On September 7, 2017, Plaintiff saw a Dr. Bradley for shoulder pain, which was causing problems with her thinking and concentration.

49.     On September 12, 2017, Plaintiff met with Tracy Hadel, who was a counselor from the EAP program that Stan Roux recommended that Plaintiff contact.

50.     In September 12, 2017, Dr. Julia Dragnich took Plaintiff off work for anxiety and lack of sleep. Plaintiff was crying and depressed. Plaintiff took vacation and three (3) d-days instead of going on disability. Tracy Hadel and Dr, Dragnich recommended her to see a psychiatrist.

51.     On 9/20/2017, Plaintiff underwent an IOP intake meeting at SMMC at 3:00 p.m. Although Plaintiff's father remained in serious condition; Plaintiff, was in contact with Stan Roux and Mr. Lester daily.

52.    Stan Roux had told Plaintiff she needed to reach out for EAP, apparently regarding Plaintiff as disabled. Plaintiff was not doing well because due to lack of sleep. Shortly thereafter, Plaintiff had a meltdown at the hospital requiring her sister to come sit with Plaintiff.   She was substantially limited in her ability to think and concentrate and continues to be so today.

53.    Tracy Hadel had recommended that Plaintiff see a Psychiatrist. Plaintiff saw Dr. Aznaurova on September 20, 2017.   Plaintiff went to the IOP intake meeting the same day.

54.    Plaintiff was off work on short term disability from September 25, 2017 to December 4, 2017. During this time, Plaintiff kept Stan Roux, Waring Lester and Fern Shaw involved in Plaintiff's medical leave. During this time Plaintiff's mother passed away on October 11, 2017. Plaintiff, still acutely depressed, asked to return to work on a reduced schedule. Plaintiff asked her doctor to return because, historically, if you, as a member of management, and miss peak season UPS retaliated against the employees.

55.    Plaintiff also recalled her conversation with Stan Roux regarding John Jardes and how much retaliation he received for taking off during peak. Plaintiff expressed this concern to Dr, Aznaurova, who indicated she would allow Plaintiff to return to work; but, on a part- time basis to see how Plaintiff would do with the medication and the problem with sleeping.

56.    From December 4, 2017 to December 31, 2017, Plaintiff was working five (5) hours per day to accommodate her disability.   Plaintiff received her stock and pay Plaintiff went back full duty January 2, 2018,

57.    Upon Plaintiff's return back to work, on full duty, Plaintiff learned Mark Bowen, Division Manager had covered the Division in Plaintiff's absence. Stan Roux and Plaintiff spoke prior to returning back to Division. Stan Roux told Plaintiff that Mark Bowen would be there for a week or two to get Plaintiff back on track in Division. Mark Bowen would run

conference calls on 6 a.m. call and 4 p.m. call. Waring Lester would communicate through Mark Bowen during that time. Plaintiff was still attending counseling sessions with Tracy Hadel through EAP, and remained under the care of Dr. Aznaurova, her psychiatrist.

58.     Plaintiff continued to see medical doctors for severe depression, anxiety, as well as a rheumatologist.

59.     In the beginning of February, 2018, there was another safety visit.   Eventually, Plaintiff earned the Eagle Award for safety, as the best in the District for February of 2018. Plaintiff had been instructed by Fern Shaw to work the pre-load since the pre-load was not on plan. Notably, Plaintiff's pre-load had been on plan until Wardell Hooks became pre-load Manager at Lester's insistence.  Plaintiff, and other Division Managers, were to work their pre-load until it was on plan.

60.     This meant Plaintiff had to be at work at 2 a.m. for pre-sort meetings, as well as her own job functions as a Division Manager. Sometimes, Plaintiff would not leave to go home until after 4:00 p.m. call was over. This meant Plaintiff was regularly working an excess of 15 to 16 hours per day and certainly more than she was before she engaged in a protected activity.

61.     On February 2, 2018, Plaintiff saw Dr. Aznaurova. Plaintiff was not sleeping well and could not take sleeping medicine since Plaintiff was not getting eight (8) full hours of sleep.

62.     Because of the pre-load hours, Plaintiff's medication was getting out of whack with the new hours of work. Dr. Aznaurova eventually concluded that Plaintiff was depressed and substantially limited in her ability to sleep, think and concentrate and supported Plaintiff's request for accommodation.

63.     On February 5, 2018, there was another Region Safety Meeting. During this time in February, there was also a District HR Meeting. Pete Elroy from Region was also in attendance. Stan Roux came to the Kansas City Building as well.

64.     Plaintiff was told by Karen Augustine that UPS had been looking at the follow up information on the discipline that had been taken on the service providers in Plaintiff's division. This was one (1) of the only parts of the CAPS that Pete Elroy had brought up during previous reviews. There was a driver who was PR seniority that Mark Bowen had put back on the street because he deemed that crash unavoidable.   But Mr. Bowen was not held accountable as Plaintiff was, even though Bowen was in charge.

65.     Plaintiff had not been part of that investigation as it was within Plaintiff's first few days back to work while Mark Bowen was still running the Division; and, Plaintiff would leave early to see doctor. Stan Roux had Plaintiff prepare a write up on the incident, even though other Division Managers were doing the same thing without discipline.  Plaintiff's replacement, Mr. Bowen, an individual outside the protected category, was not disciplined at all, even though his performance was the same or worse than the Plaintiff's.  After Mark replaced the Plaintiff, his performance was the same or worse than Plaintiff's yet he was not placed on a MPIP or threatened with demotion.

66.     Stan Roux then told the Plaintiff that a Division Manager did not have a right to do that without consulting the certain Managers. Plaintiff confirmed to Stan Roux that she has always done that and that he may want to reiterate that to the other Division Managers because it happened several times within the District.

67.     During peak Anthony had brought back a seasonal driver and so had Mark Bowen, and others, according to Karen Augustine and Bryan Lenox. When Plaintiff asked Karen Augustine about this, she told to Plaintiff she was to involve Augustine and Bryan Lenox on every crash more, even though the other Division Managers did not report all their crashes. This is evidence of stricter scrutiny because Plaintiff had engaged in a protected activity.

68.     Nonetheless, Karen Augustine recalled both incidents that the Plaintiff inquired about. During this visit Plaintiff was told by Karen Augustine they were trying to pin this on

Plaintiff and dig up things in her Division to try and demote her. Pete Elroy was in the office for a long time talking to Stan Roux and others. Karen Augustine told Plaintiff that Pete Elroy was upset that Waring and Stan Roux had little documentation on Plaintiff, and this upset UPS management.

69.     So, Plaintiff was asked to come into the office. Waring Lester and Stan Roux reviewed the Plaintiffs QIP, and Plaintiff asked how she was being held accountable for other persons' actions and that was not the way the QIP process worked.  But Plaintiff agreed she would work on the things that she had been responsible for.

70.     Plaintiff also brought up the support with staffing and the training of new supervisors. Stan Roux told Plaintiff that Waring Lester and Plaintiff would get together and go through it and that he wanted a write up on how that would look. This meeting lasted all of 5 minutes because Stan Roux and Waring Lester had to catch a plane.

71.     Plaintiff told Karen Augustine, that if she was one that had the most help needed and was such a detriment to UPS, you would think she would have had more of a review on my performance. Karen Augustine said, " That was for show so they could say they reviewed your performance because they got their ass kicked by Pete Elroy because they had nothing on you."

72.     Despite the hostile work environment, Plaintiff was still coming in working pre-load, daily, in Kansas City.  Plaintiff was then asked by Waring Lester to drive to St. Louis and meet with him on March 21, 2018. Plaintiff was not informed what this meeting was about. She asked what she needed to bring and was told by Mr. Lester, "Bring whatever you think you should bring."  Again, Plaintiff had not been treated this way before she engaged in a protected activity.

73.     So, Plaintiff drove to St. Louis, arriving in afternoon. Plaintiff was greeted by Mr. Lester who took her back into a private conference room away from other offices. Mr.

Lester asked if she had eaten. Plaintiff replied she had not. Mr. Lester retrieved a salad from the front office and gave it to her to eat.

**74.**     Shortly after that Stan Roux arrived and they all sat at the conference table. Stan Roux asked Plaintiff if she knew why she was here. Plaintiff replied she did not. Stan Roux said they were going to review her performance in detail.

**75.**     Plaintiff asked why she was not given the opportunity to bring files and information on the subject and Stan's response was, " Go get your lap top."  Plaintiff retrieved her lap top as Mr. Lester began to review Plaintiff's service performance. The first item reviewed was second attempts on certain messages. Plaintiff was on plan.

**76.**     Mr. Lester then fumbled through some papers to attempt to find the elements that Plaintiff was off plan on. On each element, Plaintiff was asked to respond and describe her plans to get on plan and what the Plaintiff was doing with it. Given the tone of the meeting and the hostile environment, Plaintiff then knew that whatever answers she would give were not going to be good enough when Stan Roux took over the conversation.

**77.**     Then, Stan Roux asked Plaintiff if she was doing head to heads with the dashboard, and why then was she out of compliance on her own training?  Plaintiff stated this was false. Plaintiff responded that she had all her training completed and copies of it. Plaintiff stated that she stayed late on a Friday to complete it and that Julia Lewis and Roger Riddle were there as well. Julia Lewis had helped her print out that particular training because it was printing sideways.

**78.**     Thwarted, Stan Roux seemed frustrated and said that he had a conference call that he had to be on and but that the meeting would resume. Waring Lester stood up and began to leave. Plaintiff asked Waring Lester why he was leaving, and didn't he want to stay and talk to her?

**79.**     After Stan Roux left, Plaintiff asked Mr. Lester " What are we doing here." It's very apparent that you all didn't asked me to drive all the way to St. Louis to go through my

QIP. You have had many opportunities to do that." What are we doing?" Mr. Lester said, "Well Susan what do you want to do for the next six (6) months or a year or two down the road?" Plaintiff responded, "I want to do my Job. I want to run the West Central Division and I still believe that I can fix it with the right support."

80.     Waring asked Plaintiff when she planned to retire. Plaintiff responded not for another three to four (3 to 4) years. Waring responded, "Well Susan we are at the end of the runway with you. I am getting beat up every day for the safety results in Kansas City. People are questioning me if I can do my job now."  But UPS never provided Plaintiff with the tools to succeed.  Plaintiff had a disability and requested leave, so UPS set her up to fail.

81.     Stan Roux came back in at that time. Plaintiff then asked Stan, " What is this all about Stan? Let's just cut through the bullshit and tell me why you asked me to drive down here?" Stan slid a piece of paper across to the Plaintiff. It was a letter informing her that she would be put on the MPIP program. Plaintiff was shocked. Plaintiff knew that this was not the way the MPIP program generally was implemented.

82.     Plaintiff asked Stan Roux, "What if I don't sign this?"  Stan said, "I recommend that you do." Plaintiff's response was, "I am not asking your recommendation. I am asking you what happens if I don't." Stan Roux's responded, "We would have to take other measures. Susan you're not being fired or anything like that."

83.     Plaintiff ask for a copy of document, but Stan refused to give her a copy. Plaintiff felt like she was being bullied and began to get upset. Plaintiff asked to be excused. Plaintiff excused herself to go to the ladies room where she sobbing. Upon Plaintiff's return she told them was done for the evening. Plaintiff was emotionally and physically drained.

84.     Plaintiff was having another anxiety/panic attack. Stan Roux asked several times if Plaintiff was going to be "OK". Plaintiff responded, No. I just want to go back to the hotel.

Stan Roux asked if the Plaintiff would be ok driving myself to the hotel. Plaintiff packed her brief case and left.

**85.**     Before leaving Plaintiff asked Stan Roux if there was somewhere she could look up the MPIP process. He said UPSers.com. Plaintiff went back to the hotel room to see if she could find it. Plaintiff could not find it anywhere.

**86.**      Stan Roux called Plaintiff and asked where she could find it. Stan Roux responded, "The procedures changed, it is not on UPSers.com. They will have to send it to Waring Lester and he will determine what elements you will have."  Stan Roux then said, "The MPIP is a pretty rigorous and intense process. I don't even know in the three (3) months you can even make it." Plaintiff said, " You have me drive to St. Louis to give me a piece of paper and tell me I am on MPIP, tell me you advise me to just go along with it. You won't give me a copy of it. Then when I ask for information on it, you tell me now there is none that I can look at. The manager retaliating against me has full control over this and now you're telling me that I won't be successful? Seriously Stan?" Stan's response was very angry, "I am getting agitated with you and I am not going to discuss this right now. You need to get some rest and we will talk at breakfast. I was just checking to make sure you made it to the hotel ok."

**87.**     The next day Plaintiff had not slept. She woke up early and spoke to her husband.

**88.**     Plaintiff's husband told her to lay back down and try and relax. Plaintiff tried to, but she was having chest pain and shortness of breath. She called her son-in-law who is a paramedic. He told plaintiff to lie down and relax, and if it didn't subside call 9-1-1. Plaintiff called and left a message to Stan Roux that she would be late and was not feeling well. Plaintiff's husband called and he was concerned she was having a heart attack. During their call, Stan Roux called.

**89.**     Plaintiff answered his call but still had her husband on phone. Plaintiff told Stan she was talking to husband and thought she had conferenced them in. Stan and husband

began to speak about Plaintiff and Stan Roux told Plaintiff's husband he could be a hotel in five (5) minutes. Plaintiff's husband asked if Stan Roux was a doctor, to which, " No." Plaintiff's husband called  9-1-1 along with the Hotel Manager to go and sit with her until they arrived. Upon the paramedics arriving at hotel, Plaintiff was evaluated and it was determined Plaintiff was not having a heart attack, but a panic attack. Plaintiff's husband drove to St. Louis to bring Plaintiff home to follow up with her doctors.  This was timely and proper notice of the need for FMLA leave.

**90.**     Plaintiff met with Dr. Aznaurova on Friday March 23, 2018, and Dr. Aznaurova again recommended Plaintiff seek accommodations for disability.

**91.**     Plaintiff returned to work on Saturday, March 24, 2018. Plaintiff continued to work pre-load and found it hard to concentrate during meetings with the increase of the medication to help with anxiety. Plaintiff requested that she move some vacation days to take some time off.  Plaintiff continued to have anxiety and was not sleeping well. Plaintiff was being forced to work different hours and was not receiving a regular sleep schedule. This increased the Plaitiff's anxiety and depression.

**92.**      Plaintiff went back into the intensive outpatient therapy at SMMC.  Plaintiff went on short term disability from 04/06/18 to 11/11/18, then to long term disability on 3/27/19. Plaintiff was, and continues to be, substantially limited in her ability to think, concentrate, and sleep.

**93.**     After the first review with Region over the ADA accommodation, the plaintiff was allowed to record that meeting. In that meeting, Eric Day told the plaintiff at the beginning to hurry up during review.

**94.**     After the first review with Region over the ADA accommodation, the plaintiff was allowed to record that meeting. In that meeting, Eric Day told the plaintiff at the beginning to hurry up during review.

95.     Over the next months, Plaintiff made several documented attempts to find a resolution for an ADA accommodation that had been supported by her doctors.   Plaintiff requested the ability to tape record certain meetings and an agenda for certain meetings consistent with Battle v. UPS.  UPS refused to engage in a good faith interactive process. Exhibit 1 and 2.

96.     UPS granted Plaintiff leave as an accommodation.  Exhibit 3, 4, 5, and 6.

97.     On July 2 and 3, 2018, Plaintiff and her husband spoke to Eric Day about the results of the Region ADA Committee the last of June, 2018.  Plaintiff and her husband asked Mr. Day what UPS's proposal was.  Mr. Day did not tell the Plaintiff and her husband that UPS had approved a notetaker.  Nor did he tell her in the email attached as Exhibit 7.

98.     Plaintiff again followed up with Mr. Day, and Mr. Day yet again failed to disclose UPS had approved a notetaker.  Exhibits 8, 9, 10, 11, 12, 13, and 14.  Had Mr. Day acted in good faith, Plaintiff would have taken UPS' proposal that a notetaker be provided in lieu of a tape recording to her physician for approval.  Had her physician approved, Plaintiff would not have retired.

99.     Eric Day mentioned a notetaker on one occasion in Exhibit 15.  But Mr. Day's email omits the critical fact that UPS had approved a notetaker.  If Plaintiff had known this, but she did not, Plaintiff would have presented this accommodation to her physician for approval.

100.    But Mr. Day continued to act in bad faith by refusing to tell Plaintiff UPS had approved a notetaker.  So, Plaintiff went off on leave and explored retirement.  Exhibits 16, 17, and 18.

**101.**     As she was making a decision, Plaintiff again pressed UPS for answers to her questions on her proposed accommodation.  Exhibit 19 and 20.  Mr. Day once again did not disclose that UPS had offered a notetaker.

**102.**     But Plaintiff followed up again and reiterated her questions.  See Exhibit 22.  And Mr. Day continued to conceal the fact that UPS had approved a notetaker.  Exhibit 23.  But Plaintiff continued to try, begging for answers, so she could avoid retirement.  Exhibit 24. And then Mr. Day shut down the process all together.  Exhibit 25.

**103.**     Mr. Day indicated that her position had been filled in Exhibit 25, but UPS knew other Division Manager positions were soon to be vacant.  But UPS did not want Plaintiff to return to work because of her disability and associated accommodation requests.

**104.**     In January of 2019, Plaintiff once again inquired about her accommodation she had requested, but UPS again failed to respond in good faith and mislead Plaintiff again by failing to disclose UPS had proposed a notetaker.

**105.**     So, Plaintiff finally was forced into retirement because UPS failed to engage in a good faith interactive process or provide reasonable accommodations

**106.**     UPS replaced Plaintiff with a person who had not engaged in a protected activity and who not disabled.  UPS would not let Plaintiff know what status she would be or what she would be doing. During these days UPS attempted to prove that she did not have the ability to hold her Employees accountable in order to fabricate a reason for termination, but UPS failed.

**107.**     As the emails show, Plaintiff had made several documented attempts to find a resolution for an ADA accommodation that had been supported by her doctors.   Plaintiff requested the ability to tape record certain meetings and an agenda for certain meetings consistent with Battle v. UPS.  UPS refused to engage in a good faith interactive process.

**108.**    So, Plaintiff finally was forced into retirement in 2019 because UPS failed to engage in a good faith interactive process or provide reasonable accommodations

**109.**    UPS replaced Plaintiff with a person who had not engaged in a protected activity and who not disabled.  UPS would not let Plaintiff know what status she would be or what she would be doing. During these days UPS attempted to prove that she did not have the ability to hold her Employees accountable in order to fabricate a reason for termination, but UPS failed.

**110.**    Indeed, Plaintiff has copies of files that prove Plaintiff held her employees accountable, and these reviews show Stan Roux was involved in these meetings. Plaintiff has had multiple crisis in her life with almost losing her father twice, to the death of her Mother. Plaintiff was stressed about possibly having the return of cancer, going through menopause, and being harassed by Mr. Lester.

**111.**    Plaintiff was harassed daily with text and comments from Fern Shaw.  At one point, Fern Shaw even made a comment to Plaintiff, "What if I alleged your father wasn't sick" She said this on the third (3rd) day Plaintiff returned from Full disability in January. She made the comment that everything that had gone wrong in Plaintiff's Division was Plaintiff's fault and that Plaintiff made it happen. Roger Riddle witnessed this because Plaintiff had her on Speaker.   Such conduct would not have happened, had Plaintiff been allowed to tape record.

**112.**    Plaintiff then called Cindy Rosen and Stan Roux. Plaintiff was in the restroom at UPS sobbing and angry by her harassment. Stan had me go home to calm down. These Staff Members took the opportunity during the crisis's in Plaintiff's life to retaliate against Plaintiff for speaking out about the discrimination and harassment that had been committed by Mr. Lester.

**113.**    After she requested accommodation, Plaintiff was asked on several occasions why she didn't retire. Cindy Rosen asked Plaintiff this after she reviewed her interview with Mr.

Lester.  Also, Stan Roux and Eric Day asked Plaintiff when she intended to retire several times.

**114.**     Plaintiff knew this was the way UPS avoided their duty to accommodate persons with disabilities. Instead of dealing with the person who was the problem, UPS, as a matter of policy, attempts to quiet the victim by intimidation or just make them go away.

**115.**     UPS' treatment of similarly situated Division Managers who did not have a disability or who had not requested a disability is circumstantial evidence of this policy. Some examples include Mark Bowen, Christi Wilson, Ron Hines, and Vinnie Manual. Mark Bowen, Christi Wilson, Ron Hines, and Vinnie Manual were all Division Managers who never requested accommodation, engaged in a protected disability, or identified themselves as persons with disabilities, yet UPS never placed them on a MPIP, even though their performance was the same or much worse than Plaintiff's.  Indeed, Mark Bowen, who replaced the Plaintiff, worked a year in Plaintiff's former Division as Division Manager, and the Division did not improve, but he was not placed on a MPIP.

**CAUSES OF ACTION**
**COUNT I –  DISABILITY DISCRIMINATION**

**116.**     Plaintiff re-alleges the foregoing against UPS, as if fully set out herein.

**117.**     This is an action for a violation of Plaintiff's rights under Kansas Act Against Discrimination and Title I of the ADA, as amended by the ADAA.  As demonstrated the facts alleged herein, Plaintiff is disabled, she is otherwise qualified, and she requested a plausibly reasonable accommodation.  Lincoln v. BNSF Ry. Co., 900 F.3d 1166 (10th Cir. 2018).  Plaintiff has also been subjected to stricter scrutiny, disciplined in violation of UPS policy, and disciplined for false reasons.

**118.**     Plaintiff suffers from depression and other mental impairments.   With accommodations such as an agenda and a tape recorder, Plaintiff can perform the essential functions of her job.  But UPS failed to engage in a good faith interactive process and has denied Plaintiff a reasonable accommodation in violation of the ADA.  Had UPS

engaged in a good faith interactive process and granted Plaintiff a reasonable accommodation as required by the ADA, Plaintiff would still be working and would not have retired.

119.    Plaintiff is, or was regarded as, a person with a disability by virtue of her mental impairments.   Plaintiff's physicians have concluded that her mental impairments substantially limits her ability to sleep, think and concentrate and will continue to do so in the foreseeable future.

120.    Plaintiff requested an accommodation of an agenda for disciplinary meetings and the ability to tape record.  A jury had previously held that such accommodations were reasonable for one of her former Division Manager peers in Battle v. UPS, but UPS has ignored this jury verdict.   UPS, through Stan Roux, has continued to refuse to allow persons with disabilities agendas and the ability to record during Stan Roux's tenure.

121.    At least five individuals with a disability have requested these exact accommodations, but Stan Roux has denied the requests without explanation.  Without proper explanation, UPS denied these accommodations, even though they were reasonable, and UPS should be collaterally estopped from denying that Plaintiff's requested accommodations were, and are, reasonable.

122.    Defendant has discriminated against Plaintiff on the basis of her disability by failing to accommodate her and holding her accountable under circumstances similarly persons without disabilities such as her replacement, Mark Bowen, and her other Division Manager colleagues were not.  Plaintiff was subjected to a hostile work environment, placed on a MPIP in violation of policy, and subjected to stricter scrutiny.

123.    Plaintiff initially requested an accommodation of an agenda and the ability to tape record her meetings, with UPS retaining the tapes so Plaintiff could address her short-term memory deficits.  Plaintiff's physician supported this request, but UPS refused to engage in a good faith interactive process.  Indeed, UPS' response was a categorical

refusal without explanation.   With accommodation, Plaintiff could have performed the essential functions of her job, so she was a qualified individual with a disability.  But without the accommodations, Plaintiff could not perform her job and was forced to retire.

**124.**     Defendant's actions have been willful, wanton, and intentional, meriting punitive damages.

**125.**     As a direct and proximate cause of Defendants' acts or omissions as alleged herein, Plaintiff has lost wages and earnings, lost fringe benefits, lost earning capacity, has endured damage to her reputation, mental, emotional, and physical suffering, and has incurred expenses which would not otherwise have been incurred, and incurred other such special damages in an amount to be proven at trial.

<u>**COUNT II – RETALIATION DISABILITY**</u>

**126.**     Plaintiff re-alleges the foregoing against all Defendants as if fully set out herein.

**127.**     This is an action for a violation of Plaintiff's civil rights pursuant to the Kansas Act Against Discrimination and the ADA.

**128.**     Defendant has retaliated against Plaintiff for filing an EEOC charge and requesting accommodation in violation of the Kansas Act Against Discrimination and the ADA by placing her on a false performance improvement plan and refusing to accommodate her, resulting in Plaintiff's forced retirement.

**129.**     As recognized in *Battle v. UPS*, Plaintiff's requested accommodations were reasonable.  UPS has a practice of retaliating against its employees who request leave or other accommodations, particularly during peak.   UPS regularly violates its own disciplinary policies to punish persons who request accommodations or leave by subjecting them to stricter scrutiny and disciplining them more harshly than employees who have not requested accommodation or filed an EEOC charge.

**130.**     Mark Bowen, Christi Wilson, Ron Hines, and Vinnie Manual were all Division Managers who never requested accommodation, yet UPS never placed them on a MPIP,

even though their performance was the same or much worse than Plaintiff's.    Plaintiff's

performance is documented in Exhibit 25.  Bowen and Jardes' performance was worse

than Plaintiff's.  Indeed, Mark Bowen, who replaced the Plaintiff, worked a year, and the

Division did not improve, but he was not placed on a MPIP.

**131.**    As a direct and proximate cause of Defendants' acts or omissions as alleged

herein, Plaintiff has lost wages and earnings, lost fringe benefits, lost earning capacity,

has endured damage to her reputation, mental, emotional, and physical suffering, and has

incurred expenses which would not otherwise have been incurred, and incurred other such

special damages in an amount to be proven at trial.

**132.**    Plaintiff is entitled to punitive damages.

**WHEREFORE**, Plaintiff, prays compensatory damages for mental, emotional, and

physical suffering, damage to her reputation, embarrassment and humiliation, lost wages past

and future, lost earnings past and future, loss of earning capacity, back pay, front pay and/or

reinstatement, all in an amount exceeding $5,000,000, and only limited by what a jury determines

to be a fair and appropriate amount to make her whole, cleansing of her personnel file, a positive

reference, designation as re-hirable, a monitor to be appointed to determine ADA compliance, a

requirement that all complaints of discrimination or retaliation be kept for seven (7) years, posting

of any verdict and other relief obtained along with this lawsuit on boards at her worksite, training

for managers, for punitive damages, other injunctive relief, reasonable attorneys' fees and costs,

and a trial by jury.

Respectfully submitted,

**SUTTER & GILLHAM, P.L.L.C**.
Attorneys at Law
P.O. Box 2012
Benton, AR 72018
501-315-1910  Office
501-315-1916  Facsimile
Attorney for the Plaintiff

By:      */s/ Luther Oneal Sutter*

Luther Oneal Sutter, ARBN 95031
luthersutter.law@gmail.com

and

*Dustin L. Van Dyk*
Dustin L. Van Dyk
dvandyk@jpalmerlaw.com,

### CERTIFICATE OF SERVICE

I, hereby certify that a true and correct copy of the foregoing has been served upon counsel for the Defendant via ECF on this 14th day of October, 2020:

Anne L. Hershewe &nbsp &nbsp anne.hershewe@ogletree.com, kcmdocketing@ogletree.com, robin.russell@ogletree.com

Shelley I. Ericsson &nbsp &nbsp shelley.ericsson@ogletree.com, kcmdocketing@ogletreedeakins.com, linda.curran@ogletree.com

*Dustin L. Van Dyk*
Dustin L. Van Dyk